# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0798-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

R.G.W.,

     Defendant-Appellant.

_____

> Argued January 9, 2025 – Decided February 28, 2025
>
> Before Judges Natali, Walcott-Henderson, and Vinci.
>
> On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Indictment No. 17-04-0148.
>
> John Vincent Saykanic argued the cause for appellant.
>
> Shaina Brenner, Special Deputy Attorney General/ Acting Assistant Prosecutor, argued the cause for respondent (Carolyn A. Murray, Acting Sussex County Prosecutor, attorney; Shaina Brenner, of counsel and on the brief).

PER CURIAM

Defendant R.G.W.[1] appeals from a judgment of conviction entered after a jury found him guilty of first-degree aggravated sexual assault, second-degree sexual assault, and third-degree endangering the welfare of a child.  The court sentenced defendant to an aggregate twenty-five-year custodial term, subject to twenty-five years of parole ineligibility under the Jessica Lunsford Act, N.J.S.A. 2C:14-2.

Before us, defendant raises the following arguments:[2]

> I.  BOTH THE SUPPRESSION AND NEW TRIAL JUDGES ERRED IN DENYING THE MOTION TO SUPPRESS THE DECEMBER 7[], 2016 STATEMENT DUE TO THE STATE'S PROSECUTORIAL MISCONDUCT IN A) THE FAILURE TO READ THE MIRANDA[3] WAIVER PORTION TO DEFENDANT ALONG WITH THE FAILURE TO HAVE DEFENDANT ACKNOWLEDGE AND INITIAL EACH INDIVIDUAL RIGHT; AND B) THE USE OF AN IMPROPER MIRANDA FORM IN VIOLATION OF DEFENDANT'S DUE PROCESS RIGHTS.
>
> a.  THE FAILURE TO READ THE MIRANDA WAIVER.

[1]  We utilize initials to protect the confidentiality of child victims of sexual assault or abuse.  R. 1:38-3(c)(9).

[2]  We have reconstituted defendant's point headings to correspond to the manner in which we address the issues.

[3]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-0798-22

b. THE FAILURE TO HAVE DEFENDANT ACKNOWLEDGE AND INITIAL EACH MIRANDA RIGHT.

II. THE DECEMBER 8[] STATEMENT MUST BE SUPPRESSED DUE TO THE FAILURE TO DELIVER FRESH MIRANDA WARNINGS AS [THE] STATE CANNOT MEET ITS BURDEN OF PROVING DEFENDANT'S WAIVER BEYOND A REASONABLE DOUBT.

III. BOTH THE SUPPRESSION AND NEW TRIAL JUDGES ERRED IN DENYING THE MOTION TO SUPPRESS THE DECEMBER 7[], 2016 STATEMENT DUE TO THE STATE'S PROSECUTORIAL MISCONDUCT IN ITS FAILURE TO ELECTRONICALLY RECORD THE STATEMENT OF DECEMBER 7TH AND FAIL[URE] TO VIDEOTAPE THE DECEMBER 8[] STATEMENT PURSUANT TO R[ULE] 3:17 IN VIOLATION OF DEFENDANT'S DUE PROCESS RIGHTS.

IV. THE DECEMBER 8[] STATEMENT MUST BE SUPPRESSED DUE TO THE DEPRIVATION OF DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT[S].

V. THE PROSECUTOR COMMITTED MISCONDUCT DUE TO THE IMPROPER GRAND JURY PRESENTATION.

VI. THE PROSECUTOR COMMITTED MISCONDUCT BY PRESENTING THE FALSE TESTIMONY OF [DETECTIVE] HASSLOCH AT THE MIRANDA HEARING AS TO READING THE ENTIRE MIRANDA FORM TO DEFENDANT.

3

VII.  THE PROSECUTOR COMMITTED MISCONDUCT IN HER SUMMATION.

VIII.  THE PROSECUTOR COMMITTED MISCONDUCT BY MOVING IN BAD FAITH TO VACATE DEFENDANT'S PROPER GUILTY PLEA OF JUNE 25, 2019.

IX.  THE STATE DEPRIVED DEFENDANT OF HIS RIGHT TO COUNSEL BY NOT PROVIDING A TIMELY TELEPHONE CALL.

X.  THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING THE STATE'S FRESH COMPLAINT MOTION AS TO STATEMENTS MADE BY M.W. TO A.W. AND AT GINNIE'S HOUSE.

XI.  THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE MOTION TO DISMISS THE INDICTMENT AND DENYING THE REQUEST FOR AN ADVERSE INFERENCE CHARGE AS THE STATE VIOLATED R[ULE] 3:13-3, CASE LAW, AND DEFENDANT'S DUE PROCESS RIGHTS WITH ITS DISCOVERY VIOLATION RELATED TO DETECTIVE HASSLOCH'S NOTES.

XII.  THE TRIAL COURT ERRED IN DENYING PRODUCTION OF [A.W.]'S NOTEBOOK IN VIOLATION OF THE STATE'S DISCOVERY OBLIGATIONS; AT THE VERY LEAST, THE NOTEBOOK SHOULD HAVE BEEN REVIEWED IN CAMERA.

XIII.  THE STATE COMMITTED PROSECUTORIAL MISCONDUCT RELATED TO THE REDACTION/WITHHOLDING OF [A.W.]'S AND

4

[C.W.]'S TELEPHONE RECORDS AND OPPOSITION TO IN CAMERA REVIEW.

XIV. THE STATE COMMITTED PROSECUTORIAL MISCONDUCT RELATED TO THE WITHHOLDING OF M.W.'S SCHOOL RECORDS.

XV. THE CUMULATIVE ERROR OF THE RAMPANT AND PERVASIVE PROSECUTORIAL MISCONDUCT FROM THE DAY OF DEFENDANT'S ARREST THROUGH THE STATE'S CLOSING STATEMENT, ALONG WITH THE DOCTRINE OF FUNDAMENTAL FAIRNESS, WARRANTS A NEW TRIAL.

XVI. THE DECEMBER 8[], 2016 STATEMENT MUST BE SUPPRESSED DUE TO THE FALSE AND DECEPTIVE REED[4] ADVISORY AS AN ATTORNEY-CLIENT RELATIONSHIP UNQUESTIONABLY EXISTED AND THE STATE WAS AWARE [DEFFENDANT'S ATTORNEY] WAS "READILY AVAILABLE" AS HE WAS ON HIS WAY TO SEE DEFENDANT; THE PROSECUTORIAL MISCONDUCT VIOLATED DEFENDANT'S MIRANDA, FIFTH AMENDMENT, AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS ALONG WITH HIS NEW JERSEY STATE RIGHTS.

XVII. THE TRIAL COURT ERRED IN LIMITING THE DEFENSE EXPERT'S TESTIMONY IN VIOLATION OF DEFENDANT'S DUE PROCESS RIGHTS AND RIGHT TO PRESENT A DEFENSE.

---

4 State v. Reed, 133 N.J. 237 (1993).

XVIII. [THE FIRST MOTION JUDGE] ABUSED HIS DISCRETION A) IN ADMITTING THE VIDEO OF M.W. UNDER THE TENDER YEARS HEARSAY EXCEPTION; AND B) IN ADMITTING THE VIDEO AS A "WRITING" UNDER N.J.R.E. 801(e) AND AS A "PAST RECOLLECTION RECORDED" UNDER N.J.R.E. 803(c)(5); [THE TRIAL JUDGE] ABUSED HIS DISCRETION IN ADMITTING THE VIDEO; DEFENDANT'S DUE PROCESS RIGHTS WERE VIOLATED MANDATING A REVERSAL.

    a.   THE TENDER YEARS EXCEPTION DOES NOT APPLY.

    b.   THE "PAST RECOLLECTION RECORDED" EXCEPTION DOES NOT APPLY.

    c.   THE FAILURE TO PRODUCE M.W. FOR ADEQUATE AND MEANINGFUL CROSS-EXAMINATION BARS THE VIDEO.

XIX. THE TRIAL COURT ([THE SECOND MOTION JUDGE]) ABUSED ITS DISCRETION IN GRANTING THE STATE'S MOTION FOR M.W. TO TESTIFY VIA CLOSED CIRCUIT TELEVISION IN VIOLATION OF DEFENDANT'S SIXTH AMENDMENT CONFRONTATION RIGHT AND ARTICLE I, PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION, AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL; [THE THIRD MOTION JUDGE] ERRED IN DENYING THE MOTION TO REOPEN THIS ISSUE TWO YEARS AFTER [THE SECOND MOTION JUDGE'S] RULING.

XX. THE STATE'S IMPROPER REFERENCE TO NON-EXISTENT "PRIOR BAD ACT"/PRIOR

"MISDEMEANOR CONVICTION" VIOLATED HIS DUE PROCESS RIGHT TO A FAIR TRIAL.

XXI. THE TRIAL COURT SHOULD HAVE GRANTED THE MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO R[ULE] 3:18-2 AS TO EACH COUNT AS THERE IS INSUFFICIENT EVIDENCE AND THE CONVICTIONS ARE CONTRARY TO THE DUE PROCESS CLAUSE OF THE UNITED STATES AND NEW JERSEY CONSTITUTIONS.

XXII. THE TRIAL COURT SHOULD HAVE GRANTED THE MOTION FOR A NEW TRIAL IN THE INTEREST OF JUSTICE PURSUANT TO R[ULE] 3:20-1 BECAUSE THE CONVICTIONS ARE AGAINST THE WEIGHT OF THE EVIDENCE.

After a thorough consideration of the record against the applicable legal principles and standards of review, we reject defendant's contentions in points I, III, and V through X.[5] Additionally, we disagree with defendant's arguments in points XI through XV and further conclude they are without sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(2).

We agree, however, with defendant's contentions in points XVI and XVII and accordingly vacate defendant's judgment of conviction and remand for a new trial. More specifically, we agree with defendant that: (1) the State violated its obligations under Reed, 133 N.J. at 263-64, by providing him with

---

[5] As noted infra, in light of our conclusion the State violated Reed, we do not address defendant's arguments in points II and IV.

incomplete, inaccurate, and misleading information regarding the availability of an attorney whom defendant's family had retained on his behalf and had requested to confer with defendant; and (2) contrary to State v. Michaels, 136 N.J. 299 (1994), the court erred in limiting the testimony of defendant's expert witness at trial, who defendant sought to have testify regarding Detective Anne Psaroudis's alleged departures from the proper protocol in interviewing a suspected minor victim of sexual assault.

First, with respect to defendant's argument in point XVIII, in light of the court's misapplication of Michaels, on remand the court shall hold a hearing under N.J.R.E. 104 and reconsider the admissibility of M.W.'s video recorded statement to Detective Psaroudis. Second, regarding defendant's argument in point XIX, we are also instructing on remand the court shall reexamine M.W.'s ability to testify in court as opposed to testifying via closed circuit television. Finally, while we reject defendant's argument in point XX as a basis for reversal, at any retrial, the court shall ensure no witness references a non-existent misdemeanor charge in defendant's past. In light of our discussion and resolution of the aforementioned issues, we conclude it is not necessary to address defendant's arguments in points XXI and XXII.

I.

In this section, we discuss the foundational facts underlying all of the appellate issues in greater granularity than usual as necessary to place defendant's arguments in context. We supplement those facts in each section to address defendant's separate arguments.

In November 2016, A.W. and C.W. were living in Sparta with their six-year-old daughter, M.W. C.W.'s father, defendant, and his stepmother, defendant's wife, lived in Long Island. The two families visited each other every month or so, and for a period in 2014 or 2015, defendant was a more frequent visitor to his son's home, while he was temporarily residing in New Jersey for his employment. Defendant had a "joyful, loving . . . uplifting . . . positive relationship" with M.W. M.W. "really looked forward to seeing him" and enjoyed spending time with him.

During the weekend of November 12 to 13, 2016, defendant and his wife came to Sparta for a visit to celebrate C.W.'s birthday. When defendant arrived in the late afternoon of November 12, M.W. was happy to see him. Before dinner she played outside with defendant and after dinner, she and defendant laid on the couch in the living room and watched movies together while the other

9

adults were in the kitchen. Defendant read M.W. a bedtime story that evening, as was typical when he stayed over.

That night M.W. slept in her upstairs bedroom, and defendant and his wife slept in the guest bedroom, adjacent to M.W.'s. A.W. and C.W. slept in their bedroom on the first floor. When A.W. woke up the next morning, she first saw M.W. as M.W. was coming down the stairs. M.W. stopped at the bottom step and indicated for A.W. to come over, as though she wanted to speak with her privately. M.W. appeared "closed-in physically, like hunched–her shoulders were in. She was standing in a kind of a guarded pose, or guarded posture." A.W. asked M.W. what was wrong, and M.W. responded quietly that her "bladder hurt." A.W. stated that M.W. "would refer generally to her pee/vaginal region as 'bladder.'"

A.W. explained she had been trying to teach M.W. the proper names for body parts, and they had particular discussions about the location and size of M.W.'s bladder in relation to the need for M.W. to take breaks from playing in order to go to the bathroom and urinate. In this regard, A.W. further explained while M.W. had no medical issues related to her bladder, "she was still wetting the bed fairly frequently" so she wore a pull-up diaper at night, and she

10

occasionally still had "a pee mistake" during the daytime; and this had been discussed with her pediatrician.

A.W. asked if it hurt when M.W. urinated, and whether it burned, and M.W. responded yes to both questions. A.W. then took M.W. upstairs to the bathroom, thinking that M.W. might have a urinary tract infection (UTI).

In the bathroom, M.W. wanted to hold A.W.'s hand while she was on the toilet, and "she clung . . . very hard." Her face had a pained expression, which A.W. "interpretated as consistent with a UTI." A.W. told M.W. she probably had a UTI, which would go away quickly with a prescription, but there was nothing to do about it until they got a prescription. A.W. did not note the appearance of M.W.'s genitals.

Back downstairs, A.W. told C.W. about the suspected UTI, and they agreed to call the pediatrician. Since it was a Sunday, A.W. left a message on the after-hours line.

The family then proceeded to get ready for brunch. As M.W. sat on a bench, A.W. helped put her shoes on and defendant lifted M.W.'s shirt to put lotion on her back. M.W. responded by shrinking away from defendant and moving closer to A.W. Defendant said "what, you don't want the lotion on your back?," and he offered to put the lotion on M.W.'s hands instead, but "she

11

wouldn't let that happen, either." A.W. was surprised by M.W.'s reaction because M.W. liked lotion and loved her grandfather, and she had never seen M.W. behave that way with defendant. She asked M.W. "why don't you want the lotion," and M.W. "kind of mumbled," saying "'I just don't.'"

The family then drove to brunch, taking separate cars so defendant and his wife could leave for home directly after the meal. At the restaurant, M.W. was "squirmy" and "very restless." She appeared physically uncomfortable. She wanted A.W. to take her to the bathroom five or six times, and C.W. took her once or twice as well.

In the restaurant bathroom, M.W. clung to A.W.'s hand, still showing pain on her face and in her body language, and "the trips weren't very productive" in that she did not produce much urine. C.W. also said that M.W. appeared to be in pain during their trips to the bathroom, and he had never seen her in pain like that before. A.W. however, did not notice if M.W.'s genitals were red, and neither did C.W., who testified that he would not have wiped M.W.

At some point during the brunch A.W. received a return call from the pediatrician, who recommended that she take M.W. to the pediatric urgent care facility. At that point the meal ended. Defendant and his wife returned to Long Island, and C.W. and A.W. took M.W. to an urgent care facility.

A-0798-22

The physician's notes of the urgent care visit indicate M.W. complained of burning on urination, with pressure and frequency, and she had been experiencing these symptoms for two days. The doctor believed this information came from one or both of M.W.'s parents, although C.W. had no recollection of who told the doctor the symptoms had been present for two days.

A.W. testified that M.W. produced a urine sample, holding her hand and appearing to be in pain as she did so. And the doctor performed a physical examination, advising A.W. that M.W.'s labia and inner thigh area were red, whereas the opening to her vagina appeared normal.

A.W. expressed her opinion that M.W. might have a UTI, and based upon the rapid urine test results, the doctor diagnosed M.W. with a UTI, prescribed an antibiotic, and sent the sample out to the laboratory for further testing. The physician also recommended that M.W. drink lots of fluids, that C.W. and A.W. apply a topical cream and follow up with the pediatrician to address their concern about "a more chronic problem, which was bed wetting at night and also some urinary incontinence during the day."

After leaving the urgent care, the family went to the pharmacy to pick up the prescription, and M.W. started the antibiotic that day. A.W. testified defendant called that evening to see how M.W. was doing, and C.W. testified he

13

called a few times after that as well; they both testified that the calls from defendant were out of the ordinary. However, on cross-examination, C.W. reviewed his phone records and noted only one phone call with defendant, on November 16, 2016. Moreover, the text messages defendant exchanged with C.W. during that time period did not mention M.W. or concern for M.W.'s health.

The following day, November 14, 2016, C.W. called the pediatrician relating to the urgent care visit and M.W.'s continued symptoms, and the pediatrician's office gave advice to help resolve the symptoms and the time it should take for the symptoms to resolve. M.W. stayed home from school that day because she was still experiencing pain; and throughout the week C.W. drove M.W. to and from school because, due to her continued pain, she did not want to be on the bus.

The laboratory test results came back and indicated the presence of e-coli bacteria, and the urgent care doctor advised that the prescribed antibiotic would be ineffective in treating an e-coli infection. Accordingly, the doctor prescribed a different antibiotic to address the specific bacteria that was found. Gradually, over the course of the week, M.W. improved and she no longer had any pain.

A-0798-22

The following week, on November 22, 2016, C.W. took M.W. to the pediatrician. The doctor understood from C.W. that M.W. had been experiencing symptoms for about a week prior to the urgent care visit. However, on November 22, M.W. was feeling better. The doctor advised C.W. of his determination that M.W. had acute vaginitis; she did not have a UTI. Therefore, the doctor advised discontinuing the antibiotic prescribed by the urgent care.

The doctor told C.W. the vaginitis "could come from not cleaning yourself or aggressively wiping," that is, "either not wiping enough or wiping too hard." The doctor also expressed that M.W.'s issues could relate to her not completely emptying her bladder when urinating, which leads to bladder dysfunction, increased frequency of urination, and a feeling of urgency to urinate. At trial, the doctor further stated that vaginitis could result from friction, tight clothing or underwear, or sitting for a period of time in a urine-soaked pull-up.

The doctor recommended a topical cream, warm baking soda baths to relieve irritation and "make sure everything is clean," and not wiping "[t]oo hard or aggressively." The doctor also recommended: six weeks of practice in timed urination–that is, M.W. should be reminded to urinate throughout the day in order to avoid accidents; and techniques to squeeze all of the urine out of the bladder, which included applying pressure to the bladder either by leaning

15

forward or placing an arm across the belly. He also recommended following up with a pediatric urologist if M.W. did not improve.

On December 2, 2016, C.W. received a letter in the mail from defendant. The letter stated:

> Dear [C.W.] and [A.W.],
>
> I hope that you had an enjoyable Thanksgiving.
>
> It is with a heavy heart and conscience that I write this, as I ask your forgiveness for my inappropriate behavior in the past.
>
> I have felt like crawling in a hole lately, but I know that that will not solve any problems. So it is my hope to apologize to you both, and to earn your trust going forward, as I will exercise a complete hands-off policy in the future and be the kind of Grandfather that you are proud of and my Granddaughter does not fear.
>
> As difficult as this is for me, I know it is worse for you. Please forgive me and know that this problem will no longer be a part of our lives. I only ask that I may still be a part of your lives.
>
> With my deepest regrets,
>
> [R.G.W.]

C.W. "didn't know what [defendant] was talking about" in the letter, but he "just knew in [his] gut that something was wrong," because "who writes a letter like that out of nowhere, totally unprovoked?" He called A.W. at work,

A-0798-22

"very upset." He said she needed to read the letter, and he texted an image of it to her.

A.W. also did not know what triggered the letter, or what defendant was referring to, but she found the letter "extremely disturbing," and after reading it she was "shocked" and "heartbroken." She left work, went home, and read the hard copy of the letter with C.W. Thereafter, she called her employer's employee assistance program for advice.

Over the next few days, A.W. and C.W. kept to their normal schedules and avoided speaking to M.W. about the letter. In speaking about it between themselves, however, they came to believe the letter related to something defendant had done to M.W. the last time he visited, when M.W. was in so much pain.

Because they suspected abuse, on December 3, 2016, they called the State's child abuse hotline, which A.W. had learned about from her employee assistance phone call the day before. A.W. also called the pediatrician and left a message, and she reached out to other people and agencies she thought might be able to help.

In later speaking with the pediatrician, A.W. asked whether M.W.'s symptoms from her last visit could be related to a sexual assault. The

17

pediatrician stated that they could, and he said if A.W. had any such concern, she should bring M.W. to Ginnie's House in Newton for a forensic interview. Ginnie's House is a child advocacy center, which is "a neutral child friendly location" that "has the resources to facilitate . . . forensic interviews."

C.W. and A.W. first spoke with the Sussex County Prosecutor's Office (SCPO) on December 5, 2016. Detective Psaroudis[6] from the SCPO also suggested having M.W. interviewed at Ginnie's House and that C.W. and A.W. should tell M.W. they received a letter and ask if she knew anything about it.

C.W. and A.W. visited Ginnie's House to understand how it operated, and they scheduled a time for M.W. to be interviewed. However, they canceled the interview because they "didn't know anything about what had happened." At that point, M.W. had not disclosed any abuse, and they did not want M.W. to be traumatized by a stranger in a strange environment asking her a bunch of questions. A.W. wanted to know if there were "any other options to try to find out more information about what this letter meant?"

Accordingly, taking Detective Psaroudis's suggestion, she and C.W. spoke with M.W., telling her that "Grandpa had written a letter apologizing for

---

[6] In the record, Detective Psaroudis is sometimes referred to as Detective Beverly.

something," and "we did not know what he was apologizing for, and did she have any idea." M.W. said "no, I don't know," and she suggested that they write defendant a letter "asking him why he's sad." They did not show M.W. the letter.

In addition, in coordination with Detective Psaroudis, A.W. agreed to have a phone call with defendant that would be recorded. A.W. sent a text message to defendant, asking to speak with him, and their recorded phone call occurred on December 6, 2016, with A.W. located at the Sparta Police Department in the presence of Detective Psaroudis, as well as Detective Brian Hassloch of the Sparta Police Department. The recording was played for the jury, and a transcript was made.

During the call, defendant began by apologizing. However, throughout the conversation he admitted only inappropriate behavior and inappropriate thoughts relating to M.W. He did not admit any acts of sexual assault.

Defendant stated:

> I'm really sorry [A.W.]. . . .
>
> . . . I can't explain it, . . . there's no making it right. I just don't want to make it any[]more wrong . . . [W]hen we were there [for] . . . [C.W.]'s birthday . . .
>
>     . . . .
>
> . . . I could tell that . . . [M.W.] was scared to death of me and you know my grab ass and stuff that I was doing

19

with her, she's grown up and she knows better now and I was supposed to be the adult in the room and I just wasn't and I'm sick about it.

    . . . .

I hope I haven't hurt [M.W.], I really, really do. I don't . . . know where she's at naturally with what was going on or what happened. . . . [A]ll's I can say is . . . I know it'll never happen again.

Defendant also asked if M.W. was "hurt," and A.W. responded when they took M.W. to the urgent care, believing she had a UTI, the doctor found "some abrasions." Defendant then said:

Uh [A.W.], I didn't do anything to cause any abrasions. . . . I never did anything but . . . you know grab ass with her on the couch and stuff like that. . . . I never did anything more than that. I never molested her, touched her sexually at all . . . I just felt like you know I have big hands, I got a little too close to her private parts and sometimes it was just like, oops, you know? But no, I never did anything . . . please, no.

    . . . .

If there's some abrasions or anything . . . no I don't know about that, really.

A.W. then told defendant: "Well . . . it was red" and "maybe I misunderstood," and defendant responded:

Yeah no, I, I never . . . and any time that I've ever had my hands close to her, she's been fully dressed and uh, that was only momentarily then I realized you know,

20

what are you doing? You idiot get your hand out of there you know it doesn't belong there and that was it and that's what I'm feeling so bad about like I should have been the adult in the room you know? And uh, no that's what I'm feeling bad about. I . . . the only time I ever touched her when she was naked was when I changed her diaper that one morning when I was there and I used a wash cloth to wipe her down and that was it.

. . . .

Just from top to bottom, wipe in the front, wipe in the back.

. . . .

I could tell by the way she was standing there looking at me that she was very nervous about that. I tried to keep her calm like, let's just wipe you down so you don't have pee on ya and let's get some, get you dressed. But, uh . . . I just, I just feel like (sighs) no, please. I couldn't ever do anything . . . to her like that.

. . . .

And, and you know . . . (sighs) that's what, that's what I'm feeling bad about, is just the grabbing and uh . . . (sighs)

. . . .

. . . I guess using that last weekend as an example . . . when I reached over and I squeezed her butt, you know she quickly pulled away and says you know, stop, don't do that. And I stopped, and so I know that she knows that I shouldn't be doing that and so . . . that's what really, really got me, you know. Before I thought she

A-0798-22

just kinda thought I was playing and horsing around but when she started acting scared and, and upset that I was doing that, then I realized, you know, she doesn't want that. She doesn't want me goofing around with her like that. I'm like, my God, how did it get to that point? Why did I let it get to that point to scare her, you know what I mean?

. . . .

. . . [T]hat morning that . . . I squeezed that lotion on my hand, I said, you want me to put some on your back? Man she just snuggled up to you and gave me a look like, no don't touch me . . . and I'm like, oh my God, what have I done? You know what I'm saying?

. . . .

So I don't know . . . I just don't want her to be afraid of me and you know if I could just say that . . . I'll never touch her, you know with my hands again at all. I mean, I don't need anything from her but a, you know hello hug and a goodbye hug and other than that there's no reason for me to even touch her, you know? And that would be all I would ever ask for. I just don't know how to fix the damage . . . .

Defendant told A.W. he wrote the letter because he had all of this on his mind after C.W.'s birthday and through Thanksgiving, and it was "just making me crazy," and "this has gotten out of hand and I'm sick about it." A.W. then suggested both defendant and M.W. may need help. She told defendant M.W. had "mooned her babysitter the other day" and "[i]t's like she's more conscious

A-0798-22

of her body than she has been before." And she then asked defendant to tell her "about other times," "like over the summer . . . maybe."

Defendant responded:

> Um, there were times where I may have my hand on her thigh if we were just sitting on the lawn chair or something. I had my hand on her thigh and then uh my wrist would be closer to her private parts but it wasn't really touching and she, she pulled my arm in a little bit and then flexed back and forth on my wrist and I should have stopped that you know.
>
>  . . . .
>
> . . . [A]nd those are the kind of things that are really haunting me, you know that I didn't just pull my hand away and say, what are you doing? But I just let it continue.
>
>  . . . .
>
> And . . . sometimes when I would pick her up and just let her, hold her on my side again I'd get some uh, flexing action and I can tell that she was very warm there and . . . , so I, I think you know . . . she's . . . trying her or you know or feeling her sexuality, I guess in a way, but I don't know how to explain that but to me again, I should have probably said not that this isn't something that we do but I just, I just let her do it, you know?
>
>  . . . .
>
> . . . I can't make up for that. I, I just feel horrible about that.

A-0798-22

. . . .

> And, yet I didn't initiate it. It's just things, just, you know, she was just being, you know and I'm thinking well I let it go when she was younger and then as she got older, I'm feeling like well she realizes that that's not right, you know.

A.W. then discussed how children develop and "start understanding their bod[ies] a little better," and defendant interjected "[r]ight," but they needed to be told "what's allowed and what's not allowed," and "what's right and wrong." And he stated: "Cause I know what's right and wrong I just didn't do it."

A.W. then mentioned she was the victim of child sexual abuse by a family member, but she kept it a secret until she was older. Defendant expressed "the whole purpose of the letter" was because keeping it a secret was "only gonna make it worse," and it would "make sure I don't ever do it again if I know that it's out there and I'm not sneaking around or doing something that I shouldn't be doing or if I get close to her, you can come up and tap me on the shoulder . . ." "And . . . that's the kind of help I need [A.W.]"

Defendant then disclosed his grandfather was a pedophile, and he knew the damage that did to his mother and her sisters. He expressed: "I don't want that to be any part of my legacy at all. I want to be the kind of grandfather that can . . . be part of [M.W.'s] life and that you can be proud of . . . ."

24

A.W. asked defendant whether M.W. had "initiate[d] other things," and defendant responded:

> Well I . . . (sighs) . . . one night we were . . . at dinner . . . and then she sat on my lap right? And then she took . . . her hands and kind of put them under her butt and just started . . . fingering my private parts you know? Just tickling around, . . . and I didn't stop that and . . . that's the only other time . . . that she ever did anything that I thought was different and that's been quite a while ago . . . and it lasted only like maybe [twenty] seconds, it wasn't really anything . . . just saying wow and, and I think at that point I did kind of just pick her up and move her over to my knee, you know.

A.W. then inquired "how long ago did she start doing this" and defendant responded "[m]aybe . . . within the last year or so." Defendant also said, "it hasn't been often." And he expressed:

> I just don't want her to be afraid of me and I don't feel like I've done anything to make her afraid of me, as long as I don't ever do anything to get close to her like that again you know or squeezing her butt. I mean she's got such a small butt, it fills up my whole hand, I can't help but squeeze it and then she don't want that done, you know.

A.W. asked defendant if he had done anything on those occasions when he had "helped us out in a pinch and came and babysat for" M.W., and defendant responded "No." He said the incidents he had been referring to all happened when there were other people around, and he wondered if there had been an

25

A-0798-22

element of seeing what he "would get by with without getting caught."  And he said that he "just shouldn't have been that close to her."

A.W. then sought to clarify why "her vagina would have been red?  Why was she so sore," and the following transpired:

> [Defendant]:  I have no idea.  [A.W.], swear to God, . . . I didn't ever do anything to her.  Nothing at all . . . like that.  If she has . . . if she had the infection . . .
>
> [A.W.]:  Yeah they said it wasn't.
>
> [Defendant]:  No.
>
> [Defendant]:  They said it . . .
>
> [Defendant]:  It . . . wasn't an infection?
>
> [A.W.]:  No, . . . they called it vaginitis, which was inflammation.
>
> [Defendant]:  I . . . don't know anything about what could, . . . could she have put something in there?  Could she have . . . um, irritated it or cut it with a fingernail or something or do you think she would have been doing anything to it?  Because honestly . . . [A.W.], never . . . never.  Any . . . touching of anything that I've ever done with her was fully dressed except for that time when I wiped her down for . . . changing her diaper, you know that morning and . . . there was no funny business then.  It was quick, wipe down in the front, wipe down on the back, put her pants on her . . . and she was hurting that day, remember?  That was when she came over here and . . . said to you that she was having pain.

26

A-0798-22

[A.W.]:  Which day was that?

[Defendant]:  Well that was . . . the morning that we left.  Was it . . . that morning or the (mumbles) . . . we had only stayed one night, right?

[A.W.]:  Yeah.

[Defendant]:  So it was the morning that she got up and she was downstairs with her wet pants on and I said . . .

[A.W.]:  Yeah.

[Defendant]:  Let's go get some dry pants on, so that was the morning that we left.

[A.W.]:  Yeah, okay.

[Defendant]:  And she had already been complaining about being . . . hurts when she pees or something like that, right?

[A.W.]:  Yeah . . . I thought when you said like getting her out of the bath, I thought you meant the bathtub not the bathroom.

[Defendant]:  No, no I, no, I just warmed up the wash cloth in the bathroom and used that to wipe her down after we took the diaper off and got her dressed.  I didn't give her a bath or anything.

[A.W.]:  I see.

[Defendant]:  . . . [A]nd then we went downstairs and had breakfast . . . . [A.W.] believe me, I never did . . . anything to penetrate her at all.  Not, never.

27

A-0798-22

[A.W.]:  Yeah . . . do you think the wash cloth could have done it?

[Defendant]:  No, no, no . . . she was all, you know there was no way.  I had the whole wash cloth flat on my hand and all's I did was start right up by her belly button and wipe straight down to her thigh and then turned, turned and flipped the wash cloth over, wiped her butt, and her cheeks off.  I didn't get any crevices or anything and wasn't she complaining that Saturday about her . . .

[A.W.]:  No.

[Defendant]:  Her pee pee hurting?

[A.W.]:  No . . . not on Saturday.

[Defendant]:  Because it was . . . she wasn't?

[A.W.]:  Mmm, mmm . . . it didn't start till Sunday.  That's when I called the pediatrician . . . Sunday morning when she woke up.

[Defendant]:  Oh that's right, because we were at dinner and you were, or having lunch and (indiscernible) call to the pediatrician then.

[A.W.]:  Yeah.

[Defendant]:  (sighs), no the wash cloth couldn't have done it. . . and the only thing, that she pulled away from me when I squeezed her butt on the couch that one day.  That was the day before.

[A.W.]:  The Saturday?

[Defendant]:  . . . [Y]up and she looked at me like, don't do that and . . . then . . . when I put that lotion on my

28

hand and asked if (indiscernible) put it on her back (indiscernible) I'm like oh my God, I've done something to really scare this child. Like you know like she didn't want me touching her. I, I never did anything to her to even get close to her genital to cause any (mumbles) irritation or something there.

[A.W.]: Okay.

[Defendant]: Has she healed up from . . .?

[A.W.]: Yeah she's not red anymore. You know they had prescribed the antibiotic but it wasn't even the right antibiotic for the bacteria that came back in the full labs so, it was, she cleared up but it certainly wasn't because of the, because of that . . . but she's, physically she's good.

[Defendant]: Okay. I, I can't, you know I just want to put your mind at ease about that [A.W.] That was never, there was never any physical contact at that point . . . (sighs) . . . squeezing her thigh and my wrist being closer to her private parts but she was always fully clothed and . . . never was there any, never was there any contact that wasn't fully clothed.

A.W. told defendant the pediatrician stated M.W.'s redness "was consistent with being touched inappropriately." In response, defendant again denied ever having done anything "to penetrate [M.W.] or cause any irritation." He further said he "did not do anything . . . to cause any swelling. In fact that whole weekend that I was there, the only time anything happened was when we were on the couch and she'd come (mumbles) running up there and I grabbed

A-0798-22

her, picked her up and I squeezed her on the butt and she jerked away and said, don't do that . . . ."  "I have never touched her skin on skin or ever penetrated anything with her. . . . Ever. . . . And . . . the closest anything ever happened was my hand on her thigh and my wrist closer to her private parts.  Never any finger contact or hand contact or directly on her private parts ever."

Defendant expressed concern that M.W. may have "experimented or tried to put something there that she shouldn't have that can cause an irritation or there's somebody else."  And he mentioned having given M.W. "a horsey back ride," with M.W. on his back, saying that he "bounced up and down with her . . . for a while."  He stated, however, that was "short lived," and he did not think it could have caused her irritation, "but maybe it did."

Defendant further stated, "if I would ever done anything to cause any kind of penetration or anything like that [A.W.], I don't think I could live with myself."  "I'm only telling you that I didn't act in an appropriate manner and stop what I knew was wrong and . . . that's just made me feel horrible."

Defendant then expressed that another reason he wrote the letter was because he thought A.W. "had a very sharp eye," and "knew things weren't right" after observing M.W. pulling away and acting scared of him.  A.W. responded that because of her background it was something she was very aware of.

A-0798-22

Questioned about this conversation at trial, A.W. admitted she had not been entirely honest with defendant, and she had been strategic with her calm tone and her willingness to discuss certain topics (e.g., whether M.W. initiated certain activities) because she wanted defendant to speak openly about anything that might have happened. She also explained her decisions about how to proceed after receiving defendant's letter were informed by her experience of childhood sexual abuse.

After the phone call, A.W. and C.W. agreed they had enough information for M.W. to be interviewed by Detective Psaroudis, and the Ginnie's House interview was scheduled for the following day, December 7, 2016.

Detective Psaroudis testified she supervised a unit of the SCPO that investigates sex crimes, and she was trained in the Child First Finding Words protocol for conducting a forensic interview of a child. She began interviewing children in 2013, and since that time she had interviewed approximately seventy-five children.

She described the Child First Finding Words protocol as "semi-structured" and allowing for "flexibility on the part of the interviewer" to adjust to "different variables of every child," including their personalities and abilities, as well as

the type of abuse and its duration.  And she said there are four steps to the protocol.

The first step of the protocol is "rapport," which entails getting the child comfortable speaking to you, assessing the child's ability to communicate and relay information, instructing the child on the rules for the interview, and going over truths and lies.  The second step of the protocol is transitioning to the topic of concern, which includes asking the child if they know why they are there to speak with you, reviewing anatomical drawings and identifying the language the child uses for various body parts, and discussing good touches and bad touches.

The third step of the protocol is the exploration of details, which involves "asking questions and . . . trying to have the child tell you what happened." Finally, the fourth step of the protocol is closure, which entails thanking the child for speaking with you, going over safety, and "return[ing] them to a neutral state of mind before ending the interview."

Detective Psaroudis testified indirect questioning was "more preferred," and direct questions were "less preferred."  She further explained, "the protocol kind of suggests an hourglass model" for questioning, such that "[y]ou try to start with open-ended questions," then move to direct questioning, and end with more open-ended questions.

32

Detective Psaroudis further testified a child's ability to recollect certain details (e.g., times, sequence, and circumstances) will vary depending upon a child's age and abilities, as well as the type and duration of the abuse. Finally, Detective Psaroudis reviewed the anatomical dolls that are available at Ginnie's House, and she described how she used them at the end of a forensic interview, once she had a verbal disclosure, to allow the child to show her what had happened.

As for M.W.'s interview, Detective Psaroudis said it was a little different than the typical interview because M.W. had not disclosed any abuse, and M.W. was not aware of why she was at Ginnie's House. Moreover, all Detective Psaroudis was aware of was defendant's apology letter, and the "admissions" defendant made in speaking to A.W. "in regard to being too touchy feely with [M.W.]"

Detective Psaroudis's interview of M.W. lasted for "a little over an hour," was recorded, and the video was played for the jury. During the interview, Detective Psaroudis asked M.W. if any people had visited her family lately, and M.W. mentioned that her grandparents had visited "a very long time ago" "before my dad's birthday" and "[t]hey slept over."

A-0798-22

When Detective Psaroudis asked M.W. to identify body parts, M.W. used the words "vagina" and "booty." Further, she identified these two body parts (and others) as parts nobody was supposed to touch. When Detective Psaroudis asked M.W. if anybody had ever touched her on a part they were not supposed to touch, M.W. mentioned her dog (Archie) and a school classmate having accidentally poked her in the eye.

Detective Psaroudis then asked M.W. direct questions about whether any specific individuals had ever touched her in a place they were not supposed to, including her mother, father, or grandpa, and she said no to all three questions. When asked who she would tell if someone had touched her vagina or booty, M.W. said she would tell her mom and dad.

At trial, when asked why she did not end the interview at that time, Detective Psaroudis explained she was aware of defendant's apology letter and the "admissions" he made in his phone call with A.W., as well as the "vaginal pain" M.W. suffered the last weekend she spent with defendant. Therefore, she believed she had "a due diligence as a law enforcement officer to make sure that [M.W. was] safe and to try to figure out what was going on and what would explain this evidence that we have in the case up until that point."

34

Detective Psaroudis then moved on to another topic, after which she returned to the weekend M.W.'s grandparents visited.  When asked what kind of things they did that weekend, M.W. described how she had played with her grandpa and he had given her a "piggy back" and a "horsey back ride," how they made things with sticks and blocks, that they ate ice cream her grandmother brought, and they watched a movie and snuggled together on the couch, which she said she liked.  M.W. also discussed her elf on a shelf.

Thereafter, Detective Psaroudis asked M.W. whether "the day that you were with Grandpa and you're watching the movie did you tell Grandpa to stop doin something?" because "Mommy thought she heard you say stop it."  M.W. responded no.

Detective Psaroudis then said "it's ok if maybe something happened that you didn't want Grandpa to do cuz sometimes adults do silly things.  Do you remember anything?"  M.W. responded by describing how a friend's father played too rough with her, spinning her around in the air and once dunking her head under the water at the lake.

Detective Psaroudis proceeded to question M.W. if anybody had ever touched her booty or spanked her booty.  M.W. responded no to both questions

35

and added she liked to spank and poke her mother's booty, which "feels like jello," and she liked to scare her mother when her mother gets out of the shower.

Detective Psaroudis asked M.W. if anyone had come into her room the night her grandparents had slept over, and M.W. said no. As a follow-up question, Detective Psaroudis asked M.W. "what about in the morning? Was anybody in the bathroom with you?", and M.W. said no. However, M.W. then clarified that defendant brushed her teeth.

Detective Psaroudis further questioned M.W. if defendant had helped her with anything else, and the following transpired:

> DP: Um so you said Grandpa was in the bathroom. He's helping you brush your teeth. Is he helping you with anything else?
>
> [M.W.]: um helping me go to the bathroom.
>
> DP: Yeah
>
> [M.W.]: Like I my bladder hurted like an I when I did go to the bathroom but he got this new watch and it buzzes every two hours
>
> DP: mm hmm
>
> [M.W.]: And it buzzes and it buzzed when I was downstairs playing
>
> DP: Ok

A-0798-22

[M.W.]: And um here and then she showed me where the bathroom was and then came back and we watched something here.

. . . .

DP: Um so how did Grandpa help you go to the bathroom?

[M.W.]: Like he just like pushed on my bladder really hurted it before I even got the watch

DP: ok can you show me on the picture where he pushed?

[M.W.]: Like like somewhere right here

DP: Yeah

[M.W.]: Gina.

DP: What part of his body did he use to push there?

[M.W.]: Hands.

DP: His hands. Why did he do that?

[M.W.]: Um well I guess he didn't know what um what I mean like um that something was going on with my bladder. Then I told my mom what happened with me and Grandpa that morning and

DP: Well . . . did your bladder hurt before Grandpa pushed there?

. . . .

37

A-0798-22

[M.W.]: Like it hurted that night and then it hurted back in the morning.

DP: Ok. So how did Grandpa end up coming into that room with you? Did you ask him to or did he just come in?

[M.W.]: Well um I he said would you like me to um get you dressed and I said sure but I didn't know he would like push on my bladder.

Upon further questioning: M.W. said she was on the toilet when her grandpa pushed on her bladder; she answered that her grandpa had never pushed on her bladder before; she did not know why he did it; he did not say anything to her while he was doing it or after; he did not tell her not to tell anyone; and she was not scared or nervous talking about it.

Detective Psaroudis asked M.W. if she had told anybody about her grandpa pushing on her bladder, and she said she told her mom. Then the following transpired:

DP: What'd you say to mommy?

[M.W.]: I said that um Grandpa pushed on my bladder and I said it really really hurted.

DP: Now you say bladder I don't cuz here you wrote vagina and that's where you pointed so I guess I'm a little confused on where he actually pushed.

[M.W.]: Well I call that my bladder and also my vagina so.

38

A-0798-22

DP:  Ok so I'll write bladder too.  So when he pushed on your bladder vagina you said he used his hand.  Did he use like his whole hand or part of his hand?

[M.W.]:  Like he used two fingers like he went like that to my um bladder.

DP:  With with two hands or just one?

[M.W.]:  Both.

DP:  Both.  Ok um and that was over the pants you said?

[M.W.]:  (shakes her head yes) umm hmm

DP:  Ok.  Do you remember anything else like that ever happening with Grandpa?

[M.W.]:  (shakes her head no) mmnt mmm

Detective Psaroudis then asked about the letter M.W.'s grandpa had sent, and M.W. said "like he said he was sorry for me but I don't know why he's sorry for me about."  Detective Psaroudis returned to questioning M.W. about when she was in the bathroom with defendant.  She asked M.W. if he had given her a bath or had helped clean her in any way, and M.W. said no.

Detective Psaroudis then asked:

DP:  I think Grandpa mentioned though that that morning that he slept over um that he helped wipe you down with a washcloth.

[M.W.]:  Yeah he did

39

A-0798-22

DP:  Yeah tell me about that.

[M.W.]:  Well he wiped me down with a washcloth cuz you know I still wear pullups at night

DP:  Um hmm

[M.W.]:  and um he I think he yeah he was a little too rough

. . . .

DP:  yeah what do you mean rough?

[M.W.]:  Like he was like going like very hard

DP:  oh ok

[M.W.]:  and then he um he did that after I went to the bathroom

DP:  He did that after you went to the bathroom?

[M.W.]:  mm hmm.

DP:  So when you said that he was very rough um when he was wiping you did you have your clothes on or off or something else?

[M.W.]:  On and my shirt

DP:  Even your shirt?

[M.W.]:  Yeah

DP:  Ok ok.  Cuz usually when adults try to like if you wore a pullup and if you needed to be washed a little

40

bit you usually do that when you don't have any clothes on.

     . . . .

DP: Yeah. So I think I think Grandpa even said that you didn't have any pants on cuz he was wiping you down and making you clean.

[M.W.]: We like pulled them down.

DP: Who pulled them down?

[M.W.]: Grandpa.

DP: Grandpa pulled them down?

[M.W.]: Got me ready for the whole morning.

DP: Ok

[M.W.]: And brushed my teeth.

DP: Oh ok so he pulled the pants down and he got a washcloth?

[M.W.]: umm hmm

DP: And like on the picture show me everywhere that he touched with the washcloth

[M.W.]: mmm just like here and here (pointing to picture)

DP: Here and there?

[M.W.]: um hmm

41

DP: Ok and you thought that he was rough.

[M.W.]: um hmm

DP: Ok

[M.W.]: Well he like wasn't rough here just here (pointing to picture)

DP: Oh ok. And did he have the washcloth in his hand the whole time?

[M.W.]: Yeah

DP: Was there a time when it was just his hand?

[M.W.]: mmm mmmnt mm

DP: Ok. Ok did he say anything to you when he was using the washcloth?

[M.W.]: No.

Detective Psaroudis then went through the entire morning with M.W. another time. During this re-telling of events, M.W. said after she woke up defendant asked her if she wanted him to help her get ready for the morning and brush her teeth and she said "sure." They went to the bathroom, and she "really had to go really bad," "and then he just like helped m[e] get all my pee out by pushing on my bladder," "[a]nd then he wiped me down with um a washcloth."

42

Detective Psaroudis asked M.W. if her grandpa had said he was helping get her pee out by pushing on her bladder, and M.W. said no. That was just what she thought he was doing. Detective Psaroudis then asked:

DP: Yeah um so when you were on the potty you had your pants pulled down so you could go to the bathroom right and then when he touched you was it skin to skin or something else? Like was his skin touching your skin on your vagina?

[M.W.]: Um yeah

DP: Yeah ok and then you said that he like kinda pushed

[M.W.]: mm hmm

DP: On your vagina or your bladder you're calling it both names um and did he say anything?

[M.W.]: (shaking her head no) nnnt nnn

DP: Ok did you say anything? Did you tell him like ow that hurts or?

[M.W.]: (shaking her head no) nnnt nnn

DP: Ok and then you got up from the toilet and what happened after that?

[M.W.]: Um then I um then he wiped me down with the washcloth and then he um brushed my teeth, I went downstairs to tell my mom what happened with me and Grandpa then we had breakfast and we opened some presents for dad.

A-0798-22

After some discussion about other topics, Detective Psaroudis questioned M.W. if defendant ever helped her go to the bathroom before, and she said no. Detective Psaroudis also asked M.W. about going to the doctor because her "vagina hurt." M.W. recalled going to the doctor and getting a watch that buzzes every two hours, and she said her bladder was getting used to it. Detective Psaroudis asked if M.W. knew "what made your bladder hurt? Your vagina hurt?," and M.W. said: "Well I think it wasn't wiping that well." Detective Psaroudis asked if anything like that ever happened before and M.W. said, "[n]o but it happened to my mom a bunch of times so right when I tell her she knew right away what to do."

Detective Psaroudis asked if M.W. remembered what she told her mother, and M.W. said "I don't really remember but I think I remember it but I don't know," and when asked what she thought she said, she responded, "I think I said Grandpa um pushed on my bladder like too hard." Upon questioning, she said she only remembered it happening one time, and she did not remember her grandpa ever touching her "booty."

Detective Psaroudis then stepped out of the interview room, and upon her return, after a discussion about M.W.'s drawing, the following colloquy occurred:

44

DP: Um the morning that Grammy and Grandpa slept over and you said that um you woke them up now did your bladder hurt like when you woke up?

[M.W.]: Um no only when I went to the bathroom.

DP: Only when you went to the bathroom. What did it feel like like what kinda hurt?

[M.W.]: Just um like it felt I felt something sting like really bad.

DP: When when did it sting when you were like peeing or

[M.W.]: Yeah when I was peeing.

DP: Ok was that before Grandpa touched you or after?

. . . .

[M.W.]: Right when he was touching me

DP: Ok. You felt it sting when he was touching you?

[M.W.]: Yeah.

DP: OK.

[M.W.]: And then it hurted like at school when I went to the bathroom.

DP: Ok

[M.W.]: And then it went away once I had this watch.

DP: Oh ok. So when . . . you said that his fingers were touching your vagina on your skin

A-0798-22

[M.W.]: mm

DP: <u>Was it just on your skin or did you like kinda feel it inside?</u>

[M.W.]: <u>Well I kinda felt it inside.</u>

DP: <u>You did? What did that feel like?</u>

[M.W.]: <u>It felt like that like some something like pointy was going through my um vagina.</u>

DP: <u>Like something pointy was going through your vagina?</u>

[M.W.]: (shakes head)

[(Emphasis added).]

Upon further questioning, M.W. denied ever seeing her "Grandpa's vagina." And when asked if her grandpa ever took pictures of her, she described innocuous events and denied he ever took pictures of her with her clothes off.

Detective Psaroudis then asked:

DP: Ok. <u>Um now you said it felt like something pointy was going through your vagina.</u> Did he like move his finger or did it like stay in one spot?

[M.W.]: <u>Stayed in one spot. Like he did that and then I it like hurted so much.</u>

DP: It did

[M.W.]: Yeah

46

DP:  Ok.

[M.W.]:  I think it made it worse

DP:  Yeah.

[M.W.]:  to push on it

DP:  Ok.  <u>Um how long do you think it was like in there for?</u>

[M.W.]:  <u>I don't know</u> like I think since I had this watch I think

    . . . .

DP:  Ok.  You got the watch after Thanksgiving?

[M.W.]:  Yeah.

DP:  But Grandpa came up for your daddy's birthday right?

[M.W.]:  Um hmm

DP:  <u>So that was before so when he had his you said his finger was in your vagina cuz you said something felt like something pointy</u>

[M.W.]:  <u>(shakes her head yes)</u>

DP:  but before that you told me he was using his fingers um how long do you think his finger was there for?

[M.W.]:  Like an hour and then he lifted it up.

A-0798-22

DP: Ok he lifted it up alright and when you were snuggling on the couch in the sleeping bag watching the movie did anything like that happen on the couch?

[M.W.]: No just when I go to the bathroom it hurts.

DP: Ok but did he ever put his finger on your vagina

[M.W.]: No.

DP: on the couch? Ok.

[M.W.]: mmnt mmm

DP: And you said he helped you go to the bathroom that one time?

[M.W.]: Yeah.

[(Emphasis added).]

Detective Psaroudis then asked M.W. to show her on the dolls how her grandpa had touched her. During that demonstration, M.W. said "[a]nd then it just really hurt me." At that point, Detective Psaroudis asked: "When you said that it felt like something sharp going in your vagina do you remember um like did he use before you showed me like four fingers. Did he use all of them or did he use one or?," to which M.W. responded "[j]ust two." Detective Psaroudis then asked which two fingers, and M.W. showed her.

A-0798-22

Further, M.W. said defendant then used toilet paper to wipe her.  She then demonstrated how he wiped her with the washcloth, "really hard."  "And then he did the same thing with my butt but not that hard."

Detective Psaroudis then asked:

> DP:  Ok.  <u>Now before you said um when you were on the toilet and he was pushing on your bladder that you felt something sharp go inside</u>?
>
> [M.W.]:  <u>I think it was his nail.</u>
>
> DP:  <u>You think it was his nail?</u>
>
> [M.W.]:  Yeah.
>
> DP:  Did you feel anything sharp when he was using the washcloth?
>
> [M.W.]:  um no.
>
> DP:  Did you feel anything go inside when he was using the washcloth?
>
> [M.W.]:  No.
>
> DP:  <u>Ok.</u>
>
> [M.W.]:  <u>So I think it was definitely his um nails.</u>
>
> DP:  Ok . . . well
>
> [M.W.]:  <u>I think like, like not more than five fingers</u>
>
> [(Emphasis added).]

Detective Psaroudis asked how M.W. felt about what happened with defendant and M.W. said "I feel good right now but it just, it really hurted." Detective Psaroudis then ended the interview.

The defense's cross-examination of Detective Psaroudis focused on whether she inappropriately made assumptions about, and interpretations of, the statements defendant made in his apology letter and in his phone call with A.W., and whether she failed to follow the correct protocol in interviewing M.W. by putting words in the child's mouth.

For example, when interviewing M.W., the child used the word "bladder," but Detective Psaroudis used the word "vagina," notwithstanding that the circled area on the body drawing encompassed not only the genital area but also down to part of the thighs and halfway up to the belly button, and notwithstanding that when M.W. showed on her body where defendant had pushed, she pointed to her abdominal area. Moreover, in numerous instances Detective Psaroudis used leading or "forced choice" questions and began the questions with statements that represented her interpretations of earlier portions of the discussion, or misstatements of M.W.'s words, as opposed to M.W.'s own words.

Defendant presented testimony from an expert witness, Joseph Del Russo. Del Russo was a practicing lawyer and former Chief Assistant Prosecutor in

A-0798-22

Passaic County, in the special victims unit, where he prosecuted crimes against children. He also taught at Montclair State University's Center for Child Advocacy and Policy.

Del Russo was one of several people who were instrumental in bringing the Child First Finding Words protocol to New Jersey, and he was qualified as an expert in the protocol. However, pursuant to the court's pretrial ruling, Del Russo was allowed to testify about protocol only as a general matter. He was not permitted to "address or opine as to the actual interview conducted in this case."[7]

We do not address Del Russo's testimony in detail here. We do note, however, relevant to Psaroudis's interview of M.W., Del Russo testified that when interviewing a child the interviewer must "take great pains to avoid bias during the interview" and "avoid making assumptions" about what the child may have experienced. Indeed, he would "hope they don't know much going in" to the interview. Thus, the interviewer should "start out with the proposition that we don't know what happened and that's the only way that a forensic interviewer should approach a child, neutrally, objectively, without any bias, without any

---

[7] Among the grounds upon which we vacate defendant's judgment of conviction is the improper circumscription of his expert's testimony at trial, which we detail in section VI of this opinion.

thoughts about . . . what may have happened." Moreover, the interviewer must be open to alternative hypotheses and explanations for what might have happened, including innocent explanations.

To promote this neutrality, the interviewer should strive to obtain the narrative from the child by using open-ended questions and avoiding forced choice, pointed, leading, or suggestive questions. In addition, the interviewer should avoid introducing information obtained from any third parties. It is "suggestive" and thus "not best practice to share with the child what other people said about the subject under investigation." Moreover, it runs the risk of introducing erroneous information that the child "may not disagree with" because they do not want to disagree with the person or get the person into trouble.

Further, Del Russo discussed the importance of the interviewer always using the child's words, because the child's words are the only ones that matter. Thus, the interviewer should not change the child's words, summarize the child's words, or interpret the child's words, "especially about vital issues in a criminal investigation." "[D]rawing inferences and restating the child's words in a dramatically different way in your own language is dangerous and not recommended."

A-0798-22

As for M.W. herself, she was eleven years old at the time of trial, and she testified by closed circuit television. She understood she was in court to testify about defendant having "touched [her] in [her] privates" when she was six years old, in the bathroom of her mother's house. However, she did not remember what happened, nor did she remember how she felt when it happened. On the other hand, when the prosecutor asked a second time if she remembered how she felt at the time, she responded: "I think, I was like–I felt uncomfortable."

On cross-examination, M.W. recalled having met with a detective, and she recalled being shown a video of her talk with the detective a few weeks before her testimony. However, the video did not help her remember anything. M.W. did recall having fun when her grandparents visited. But when asked if she "miss[ed] having those good times with" her grandparents, she responded "[n]ot really."

After the Ginnie's House interview, Detective Hassloch prepared a warrant for defendant's arrest. He also asked C.W. to call defendant to see if defendant would come to New Jersey. C.W. agreed to make the call, and his December 7, 2016, call with defendant was recorded by the police, and played for the jury.

During the call, C.W. mentioned defendant's conversation with A.W. the previous day, and told defendant that in the morning M.W. had told A.W. "some stuff . . . that happened with you guys." Defendant responded that he noticed M.W. was acting afraid of him the last time he visited, and when C.W. asked why M.W. was afraid, defendant stated:

> [Defendant]: . . . I had not done anything to physically harm her, but I have at times when we've been together had inappropriate contact as far as being close to her, being close to her bottom and her, and her genital area. Uh, but only fully dressed. [A.W.] was telling me that the pediatrician has said that there was uh, vaginal redness and things like that and [C.W.] I had nothing to do with that. Absolutely nothing.
>
> [C.W.]: Okay.
>
> [Defendant]: And I felt like when we were on the couch there that last weekend, she's running around jumping around and I reached over and I grabbed her and I squeezed her butt and she just immediately you know, pulls away and said, don't do that.

Defendant further explained the next day M.W. "scooted over and snuggled up to" A.W. when he tried to put lotion on her, and she gave him a look like "don't touch me," and he felt "horrible" and "terrible" "about it." He admitted having squeezed M.W.'s butt and put his hand on her thigh, but he promised that he had "never touched her physically in that way," meaning contact with her genitals.

54

C.W. responded that M.W. said "something different today," and he did not want to get into it over the phone. Defendant sighed and said he "can't imagine what [M.W.] said," but "if I had done something that horrible as far as reaching in to her and penetrating her [C.W.], I would, I would tell you." However, defendant further stated he "would not, [and he] did not."

Defendant then spoke about M.W. having complained on Saturday that it hurt to pee. And he talked about his having helped her on Sunday morning: removing her wet pull-up; cleaning her up with a washcloth; then getting her dressed. He said he "could tell she was still scared." However, he did not touch her with his hands; rather, he warmed up the washcloth and just wiped her down front and back.

C.W. said that no one was accusing defendant of anything, but he wanted to meet up with defendant and talk in person. Defendant agreed to drive out to New Jersey, where he was subsequently arrested and charged under a complaint warrant.

Detective Hassloch testified that upon arresting defendant he issued a Miranda warning and transported him to Sparta Police headquarters. At police headquarters, defendant was re-Mirandized and interviewed for about forty minutes by Detective Hassloch, Detective Psaroudis, and a third detective. The

A-0798-22

detectives attempted to record the interview, and a video recording was made, which was played for the jury. However, the audio did not record.

Detective Hassloch testified about his recollection of the interview, as did Detective Psaroudis. Detective Hassloch stated defendant told the police about his visit to his son's house and how that Saturday he had watched movies with M.W. and had pinched M.W.'s butt and touched her thigh. Detective Psaroudis testified defendant "stated he would touch [M.W.'s] butt and have his hand on her inner thigh near her private part too often" but "it didn't go any further than that."

According to Detective Hassloch, defendant also mentioned M.W. making "a flexing motion" on his wrist when he was holding her. And "[h]e could tell that [M.W.] was, I guess, warm down there," and "[h]e said he liked it."

As for Sunday morning, defendant described how he had taken M.W. to the bathroom and cleaned the urine off of her by wiping her down with a wet washcloth or face towel. According to Detective Hassloch, when defendant was asked about penetrating M.W., defendant "stated that he must have blacked out. Doesn't recall that. And so on."

Regarding events after the weekend, Detective Psaroudis testified defendant said he had a phone call with A.W. in which "she had accused him of putting his fingers in [M.W.'s] vagina and he didn't know anything about that." At that point, Detective Psaroudis told defendant she had been present for the call between him and A.W. and "[A.W.] had not accused him of that, but I did just interview [M.W.] and that is what she had disclosed to me." According to Detective Psaroudis, "[d]efendant then made comments that if [M.W.] said it happened, it must have happened, but he doesn't remember. And [M.W.] wouldn't lie about it." "And he also made comments that six-year-old [M.W.] was feeling curious about her sexuality by giving him butterfly kisses. And when he would hold her on his hip, she would rub against him."

As for the apology letter he sent to C.W. and A.W., Detective Hassloch testified defendant said he wrote it because he "felt that [A.W.] had a sharp eye," and "because of [his] playing grab ass . . . with [M.W.]" Detective Psaroudis testified defendant said he was "apologizing for being too touchy feely with [M.W.]"

At the end of the interview, the police provided defendant with a pen and paper so he could write an apology letter to M.W., and he did so, writing:

57

[M.W.], I will always love you and I never meant to hurt you. Please, forgive me for any pain and hurt that I have caused you.

As you grow up, I hope that what has happened will not scar you for life, and I ask you again to find it in your heart to forgive me.

Even if we never see each other again, please remember how much I love you.

Grandpa.

The following morning, December 8, 2016, Detective Hassloch met with Detective Psaroudis. They decided to interview defendant for a second time, at the Sussex County Jail, because there was no audio from the December 7 interview. The second interview was audio recorded, but not video recorded, and the audio was played for the jury, with a transcript also provided. The police did not issue new Miranda warnings to defendant before this interview. However, upon the advice of the Assistant Prosecutor, they advised defendant his family was looking for an attorney for him.

During the interview, defendant denied intentionally assaulting M.W. He admitted only unintentional harm, and the same behaviors previously discussed. For example, when asked if he "remembered anything else about the incident that could help [M.W.]," he responded:

> I mean I had the night to think and I know that (clears throat) what [M.W.] has said, evidently I did do, I, like I said and I know you won't believe me this but I, I can't remember what I did exactly. When you said, what, she was brushing her teeth and on the toilet and those two items I don't have any recollection of, only wiping her (indiscernible) I can say if I did something it had to be with when I picked her up to put her on the toilet. If I, I don't normally pick her up and put her on the toilet but all I can think of is that if I put my hand on her butt and on her chest like this and reached over, picked her up and put her on the toilet, I may have squeezed here . . . .

He admitted "that finger may have caused damage" but "[o]nly momentarily, it wasn't an intentional act." He did not remember M.W. looking like she was in pain. However, he recalled her being "[v]ery timid" as she picked out her clothes, and he remembered her scooting away from him when he later tried to put lotion on her back.

He repeated: "It was not intentional, I didn't go in there with any intention of hurting her." However, he admitted he may have been rough with her when he wiped her down, as the police had said the day before. He said:

> I certainly didn't, didn't mean to hurt her and all's I can think of is this, is you know because I, I do pinch her butt when she you know comes around and uh, I, I feel like maybe if I had her, if I was putting her on the toilet and I had her butt in my hand I probably squeezed it and you know and at that point there could have been some penetration. I don't remember.

A-0798-22

Thereafter, there was some discussion of the fact that defendant's grandfather was a pedophile who had molested defendant's mother and some of defendant's sisters. Detective Hassloch asked defendant if he thought of himself as a pedophile, and defendant responded: "Based on my actions with [M.W.], I could certainly see how that could be . . . but I haven't done it with anyone else." And when asked what was different about M.W., defendant responded "I . . . I wish I knew, I wish I knew you know."

Defendant denied looking at pictures of kids on the internet, or even thinking about doing that, and he denied being excited by any pictures of M.W. However, with respect to his being "touchy feely" with M.W. (Detective Psaroudis's words), he said that "it was just constant nagging, I know what I'm doing isn't right, why do I do it, you know what if somebody's watching and then I'd be, I would be sick that somebody saw me, you know." And he said he would worry for the next three or four days that M.W. would say something to her mother.

On the other hand, defendant insisted the behavior "[n]ever got anymore than what I'm telling you about." "The touches were the same all the time . . . and like I said, I'm supposed to be the adult I try hard to be but then I would

A-0798-22

lapse back again when I got around her certain times." He denied that any of it ever excited him.

The police then asked defendant about things he had said during the December 7, 2016 interview, for example, about how it felt when he would hold M.W. and she would snuggle against him. And when they returned to discussing the bathroom incident, defendant again stated that he had told the police what he remembered and that if there had been any penetration it would only have been accidental. When the police told defendant that M.W. said he put two fingers inside of her, and it felt like he was trying to squeeze the pee out of her bladder, defendant responded: "If she said I did that then I'm gonna say I did that also."[8] The police then ended the interview, discussed with defendant issues relating to an emergent hearing that would be held, and his wife attempting to find an attorney for him.

On April 13, 2017, defendant was indicted on three counts: first-degree aggravated sexual assault of a child under the age of thirteen, N.J.S.A. 2C:14-2(a)(1); second-degree sexual assault of a child under the age of thirteen, N.J.S.A. 2C:14-2(b); and second-degree endangering the welfare of a child,

---

[8] In his merits brief, defendant notes the transcript of this response differs from the trial transcript, which reads "If she said I did that, then I won't say (indiscernible) so."

N.J.S.A. 2C:24-4(a)(1). On defendant's motion, the court later ordered the indictment be amended such that count three was downgraded to a third-degree offense.

After extensive pretrial motion practice, which we will address in greater detail later in this opinion, on June 25, 2019, defendant pled guilty to third-degree endangering the welfare of a child, and the court accepted the plea over the State's objection that it was unsupported by defendant's admissions to an adequate factual basis. The State moved to vacate the plea, and on September 25, 2019, the court granted the State's motion.

After an approximate two-year delay due to the COVID-19 pandemic, the case was tried between March 14 and 30, 2022. As noted, the jury found defendant guilty on all counts and the court sentenced him to an aggregate twenty-five-year custodial term, with twenty-five years of parole ineligibility. This appeal followed.

II.

In points I through III, defendant contends the court erred in admitting his December 7 and 8, 2016 statements to the police. He argues the December 7, 2016 statement should have been suppressed because: (1) the police did not properly issue Miranda warnings to him; and (2) it was not audio recorded. He

argues the December 8, 2016 statement should have been suppressed because it was not video recorded, and the police did not issue fresh <u>Miranda</u> warnings.

At hearings on defendant's motion to suppress his statements, the court heard testimony from: Detective Hassloch; Detective Psaroudis; attorney Carmen Liuzza, Esq.; and Assistant Prosecutor Seana Pappas. The court also heard argument from counsel and considered the parties' written submissions.

Detective Psaroudis testified that on December 7, 2016, after M.W. had been interviewed at Ginnie's House, the police obtained approval from Assistant Prosecutor Pappas to prepare a complaint warrant for defendant's arrest. Detective Hassloch testified he orally issued <u>Miranda</u> warnings to defendant upon his arrest, after which he transported defendant to Sparta Police Headquarters.

At police headquarters, defendant was placed in an interview room and re-Mirandized. Specifically, Detective Hassloch read defendant his <u>Miranda</u> rights, asked defendant if he understood his rights, and defendant expressed that he did. Detective Hassloch then turned the form over and told defendant where to sign, after which defendant signed the form. Detective Hassloch then signed and dated the form, and defendant spoke with the police. However, Detective

Hassloch did not read the waiver portion of the form to defendant, and he did not tell defendant to read that portion of the form.

According to Detectives Hassloch and Psaroudis, defendant appeared to understand what was going on; he did not appear to be under the influence; he never asked to stop the interview; and he never asked to speak with an attorney, nor did he refuse to answer any of the officers' questions. Detective Psaroudis testified that throughout the interview defendant "[s]eemed calm and remorseful."

As for recording the interview, Detective Hassloch testified to his belief that Detective Sergeant Mulligan[9] would activate the recording system from another room in order to both audio record and videotape the interview. Both Detective Hassloch and Detective Psaroudis believed the system was working properly during the interview. However, the audio portion of the system did not record the interview, and Detective Hassloch discovered this only after the interview was over and defendant was being transported to the Sussex County Jail.

On the morning of December 8, 2016, Detective Hassloch spoke to Detective Psaroudis about the lack of audio from the first interview, and

---

[9] Detective Sergeant Mulligan's first name does not appear in the record.

whether, as a result, they should conduct a second interview of defendant at the jail. At the Prosecutor's Office, they also spoke with Assistant Prosecutor Pappas about the issue, and ultimately agreed to conduct a second interview. Detective Psaroudis called the jail to arrange the interview, and she was told they should come at 12:30 p.m.

After speaking with Assistant Prosecutor Pappas, the detectives proceeded to the jail to interview defendant. The twenty-five minute interview, which transpired between 12:40 and 1:05 p.m., was audio recorded and transcribed, but was not video recorded.

The officers did not advise defendant of his Miranda rights, although Detective Psaroudis mistakenly testified at the grand jury that they had. At the pretrial hearing, Detective Psaroudis testified to her belief that the Miranda waiver from the previous day was still valid.

The court issued a written opinion and order denying defendant's motion to suppress his December 7 and 8 statements to the police. First, the court rejected defendant's argument that the December 7 statement should be suppressed under Rule 3:17 because of the failure to obtain an audio recording.

The court found the lack of audio was a "botch . . . due to technical equipment problems" unknown at the time. To the court, the existence of the

video recording "suggest[ed] that the recording process was initiated by Detectives at the appropriate time, and that there had been a good faith effort to comply with the electronic recording requirement."

Furthermore, the court noted the various documents in which the substance of defendant's statements had been memorialized, including Detective Hassloch's notes and the reports of both Detectives Hassloch and Psaroudis. The court found the detectives' written reports "include[d] consistent information and facts that enhance[d] their reliability," and "[t]he consistency and detail provided in the [d]etectives' reports, supported by the existence of video providing a visual narrative framework, augment[ed] the reliability of the statements attributed to . . . [d]efendant." Under these circumstances, the court concluded suppression of the December 7 statement was "not appropriate and would constitute an extreme remedy." Rather, the court ruled "[t]he appropriate remedy for the technical failure at issue is an appropriate jury instruction, if requested, as contemplated and provided by R[ule] 3:17(e)."[10]

---

[10] At trial, the court instructed the jury consistent with Model Jury Charges (Criminal), "Statements of Defendant (When Court Finds Police Inexcusably Failed to Electronically Record Statement)" (Nov. 7, 2005), with respect to lack of audio for the December 7, 2016 statement, and the lack of video for the December 8, 2016 statement.

The court next rejected defendant's argument that the December 7 statement should be suppressed based upon Detective Hassloch's failure to read the express terms of the waiver section of the <u>Miranda</u> form. With respect to this argument, the court stated:

> As a valid waiver may be obtained not only without reading and signing the waiver portion of a [<u>Miranda</u>] form, but also without the presence of a [<u>Miranda</u>] form at all, this [c]ourt determines that the failure of Detective Hassloch to read aloud (or to direct [d]efendant specifically to read to himself) the paragraph explicitly waiving his rights does not establish coercion, nor does it negate the voluntariness of [d]efendant's waiver.

Considering the totality of the circumstances, including the video recording, as well as the testimony of Detectives Hassloch and Psaroudis, and the completed <u>Miranda</u> form, the court found defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights after being orally advised of each right.

Next, the court rejected defendant's argument that the December 8 statement should be suppressed based upon the failure to issue a renewed <u>Miranda</u> warning. The court found no controlling case law directly on point, but relied upon persuasive authority from other jurisdictions for its finding that:

> It is evident that a fresh recital of <u>Miranda</u> warnings to . . . [d]efendant on December 8, 2016 would have been appropriate and prophylactic. The second interview was exactly that: a second interview, not a continuation

67

of the first conversation, nor reasonably contemporaneous. However, the timing was not so distant, nor the circumstances so distinct, that controlling law would clearly require fresh warnings . . . .

Considering the totality of the circumstances, the court found defendant knew and understood the <u>Miranda</u> warnings on December 7, and he knowingly, intelligently, and voluntarily waived those rights on both December 7 and December 8. The circumstances the court cited for this conclusion included: defendant was re-interviewed after only approximately fifteen hours; the detectives who interviewed him were the same on both December 7 and 8; "though the location changed from the Sparta Police Station to the Sussex County Jail," in both settings and in the time between, defendant remained in custody; there was no evidence that defendant was forced, pressured, or coerced to speak, and no promises or threats were made; and defendant was advised that his family was arranging for an attorney to be retained.

Finally, the court found:

Defendant's statements to law enforcement on both December 7, 2016 and December 8, 2016 were imbued with an attitude of full cooperation by, and with remorse from, [d]efendant. This finding is made notwithstanding the [c]ourt's view that best practices support use of a re-Mirandizing procedure whenever initiating a new interview with a defendant, whether the temporal lapse between warnings spans hours or days,

68

and whether or not intervening circumstances are deemed inconsequential at the time. However, that failure to comply with what may most appropriately be characterized as "best practices" does not arise to a constitutional violation warranting suppressing of [d]efendant's December 8, 2016 statements, under the totality of the circumstances presented in this case.[11]

In reviewing a trial court's ruling on a motion to suppress, we must defer to the court's factual findings if those findings are supported by sufficient credible evidence in the record. State v. Bullock, 253 N.J. 512, 532 (2023). This deferential standard of review applies regardless of the existence of a video recording of defendant's statement or other recordings or documentary evidence. State v. Tillery, 238 N.J. 293, 314 (2019).

We review the court's legal conclusions de novo. Bullock, 253 N.J. at 532. This includes the interpretation of the Court Rules. State v. Tate, 220 N.J. 393, 405 (2015); State v. Anthony, 443 N.J. Super. 553, 564 (App. Div. 2016). It also includes the court's conclusions as to the validity of a defendant's waiver of the right against self-incrimination, and the voluntariness of a defendant's statement. Arizona v. Fulminante, 499 U.S. 279, 287 (1991); Miller v. Fenton,

---

[11]  In his motion for a new trial, defendant argued it was error for the court to have admitted his statements to the police. The court rejected defendant's arguments, finding no basis to disagree with the reasoning of the judge who decided the pretrial motion, and denied the motion for a new trial.

474 U.S. 104, 110 (1985); State v. O.D.A.-C., 250 N.J. 408, 425 (2022). Issues not raised before the trial court are reviewed for plain error, that is, error clearly capable of producing an unjust result. R. 2:10-2.

Applying the aforementioned standards of review to the issues defendant raises in points I and III, we conclude the court properly denied defendant's motion to suppress his statements on December 7 and 8, 2016 on the basis of any alleged Miranda violations and failures to record the interview.[12]

A.

As noted, in point I, defendant contends his December 7, 2016 statement should have been suppressed because the police gave inadequate Miranda warnings, failed to read the waiver portion of the Miranda form to defendant, and failed to have him acknowledge and initial each individual right on the Miranda form. We are unpersuaded.

The right against self-incrimination is protected under both federal and state law. The federal protection arises under the Fifth Amendment to the Constitution, U.S. Const. amend. V ("No person . . . shall be compelled in any

_____

[12] As noted, we reverse and suppress the December 8 statement because of the State's Reed violation for the reasons detailed in section V. Thus, we do not address defendant's alternative arguments concerning the suppression of the December 8 statement in points II and III.

70                                                                    A-0798-22

criminal case to be a witness against himself"), which applies to the States by virtue of the Fourteenth Amendment, U.S. Const. amend. XIV. State v. Ahmad, 246 N.J. 592, 609-10 (2021). The state protection arises under statutory and common law. N.J.S.A. 2A:84A-19; N.J.R.E. 503; O.D.A.-C., 250 N.J. at 420. New Jersey's protection is more expansive than its federal counterpart. O.D.A.-C., 250 N.J. at 420; Ahmad, 246 N.J. at 610 (quoting State v. O'Neill, 193 N.J. 148, 176-77 (2007)).

A person may waive the right against self-incrimination. State v. Vincenty, 237 N.J. 122, 132 (2019). However, in the context of custodial interrogations, "[l]aw enforcement officers must first advise a suspect of the right against self-incrimination before attempting to obtain a waiver of the right." Ibid. This entails the issuance of the so-called Miranda warnings, that is: you have the right to remain silent; anything you say could be used against you in a court of law; you have the right to the presence of an attorney and if you cannot afford an attorney one will be appointed for you prior to any questioning if you so desire; and you may exercise your rights at any time during the interrogation. 384 U.S. at 479; see also O.D.A.-C., 250 N.J. at 412, 420.

Once so advised, a defendant's waiver of the right against self-incrimination may be express or implied. Bullock, 253 N.J. at 534. "Our law

. . . does not require that a defendant's <u>Miranda</u> waiver be explicitly stated in order to be effective." <u>Tillery</u>, 238 N.J. at 316.  It is sufficient that there is some clear manifestation of a desire to waive the right.  <u>State v. A.M.</u>, 237 N.J. 384, 397 (2019).

It is the State's burden to prove beyond a reasonable doubt that a suspect knowingly, intelligently, and voluntarily waived the right against self-incrimination in light of the totality of the circumstances.  <u>O.D.A.-C.</u>, 250 N.J. at 413, 420.  "That burden of proof is higher than under federal law, which requires the government to 'prove waiver only by a preponderance of the evidence.'"  <u>Id.</u> at 420 (quoting <u>Colorado v. Connelly</u>, 479 U.S.157, 168 (1986)).

The totality-of-the-circumstances test includes consideration of such matters as:  the defendant's age, education, and intelligence; any language barriers; any prior experience the defendant had with the criminal justice system; the defendant's physical and mental condition, including any drug or alcohol problems; whether the defendant has been informed of his constitutional rights, and the time between the reading of the rights and any admissions; the length of the detention; whether the questioning was repeated and prolonged in nature; and whether physical punishment or mental exhaustion were involved. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>Bullock</u>, 253 N.J. at 534;

O.D.A.-C., 250 N.J. at 421; Tillery, 238 N.J. at 317; State v. Knight, 183 N.J. 449, 462-63 (2005); State v. Presha, 163 N.J. 304, 313 (2000).

"Beyond the issue of waiver, there are separate due process concerns related to the voluntariness of a confession.  Due process requires the State to 'prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne.'" O.D.A.-C., 250 N.J. at 421 (quoting State v. L.H., 239 N.J. 22, 42 (2019)).  This also entails a consideration of the totality of the circumstances.  Ibid.; Tillery, 238 N.J. at 316-17.  "[T]he totality-of-the-circumstances test can both root out improper police statements that result in an invalid waiver and recognize knowing and voluntary waivers." O.D.A.-C., 250 N.J. at  423.

Defendant cites no legal support for his contention that the police were required to have him acknowledge each Miranda right with his initials, or his contention that the police were required to read the waiver portion of the Miranda form to him.  Any errors by the police are merely factors for the court to consider when determining whether a defendant knowingly, intelligently, and voluntarily waived his Miranda rights under the totality of the circumstances.

The Miranda form used by Detective Hassloch, which did not require initials next to each of the rights, and Detective Hassloch's presentation of the

<u>Miranda</u> rights and obtaining confirmation that defendant understood the rights, without engaging in a specific inquiry as to waiver, do "not reflect optimal law-enforcement practice." <u>Tillery</u>, 238 N.J. at 318. Nevertheless, the record supports the trial court's conclusion that the police issued the <u>Miranda</u> warnings to defendant prior to conducting the December 7, 2016 interrogation, and defendant knowingly, intelligently, and voluntarily waived those rights by choosing to speak with the detectives. The court's conclusion was supported by the testimony of the officers, as well as the court's review of the video of the interrogation (absent audio). We therefore find no error in the court's holding that the December 7, 2016 statement was admissible as it was taken after defendant was properly Mirandized and he knowingly, intelligently, and voluntarily waived his right against self-incrimination.

## B.

In point III, defendant contends the December 7, 2016 statement should have been suppressed because it was not audio recorded.[13] We disagree.

---

[13] As noted, <u>supra</u> n.11, we do not address that portion of defendant's argument concerning the State's failure to video record the December 8 statement in light of our conclusion that statement shall be suppressed due to the State's violation of <u>Reed</u>.

Preliminarily, we note that before the trial court defendant argued the December 7, 2016 statement should be suppressed due to the lack of an audio recording. As such, our review of that ruling is de novo, as it requires interpretation of Rule 3:17. Tate, 220 N.J. at 405.

Rule 3:17(a) requires that, unless an exception applies under subpart (b), "all custodial interrogations conducted in a place of detention must be electronically recorded when the person being interrogated is charged with . . . aggravated sexual assault [or] sexual assault." Rule 3:17(a) defines a place of detention as including a police station and a county jail, the locations of defendant's interrogations.

Under Rule 3:17(d) and (e):

> (d) The failure to electronically record a defendant's custodial interrogation in a place of detention shall be a factor for consideration by the trial court in determining the admissibility of a statement, and by the jury in determining whether the statement was made, and if so, what weight, if any, to give to the statement.

> (e) In the absence of an electronic recordation required under paragraph (a), the court shall, upon request of the defendant, provide the jury with a cautionary instruction.

Thus, nothing in Rule 3:17 required the exclusion of defendant's December 7, 2016 statement. Rather, the lack of audio on December 7 was a

factor for the court to consider in determining the admissibility of the statements. R. 3:17(d); Anthony, 443 N.J. Super. at 566.

The court complied with Rule 3:17(d) in its determination that the failure to audio record the December 7 statement did not warrant exclusion of testimony relating to the statement because: the officers made good faith efforts to comply with Rule 3:17(a) and the lack of audio was the result of a failure of technology; and the video recording and the documentary evidence in the record supported the reliability of the detectives' testimony regarding the December 7 statement.

The court's focus on the reliability of the evidence supporting the December 7 statement is consistent with the purpose animating Rule 3:17. That is, in State v. Cook, 179 N.J. 533, 539 (2004), the Court "decline[d] to expand the due process requirements of the New Jersey Constitution to encompass a duty that the police record electronically a custodial interrogation." However, "as part of [its] supervisory authority over the criminal justice system," the Court decided to "establish a committee to examine and make recommendations on the use of electronic audio and video recording of custodial interrogations." Ibid.

Supporting this decision, the Court cited its well-established "concern for the reliability and trustworthiness of confessions as a prerequisite to their use." Id. at 560. The Court noted the existing requirement that the State "introduce

independent proof of facts and circumstances that tend to generate a belief in a statement's trustworthiness."  Id. at 552 (citing State v. Lucas, 30 N.J. 37, 56 (1959)); see also State v. Delgado, 188 N.J. 48, 63 (2006) ("[W]e adopted Rule 3:17 to enhance the reliability of the factfinding process in our courts."). Furthermore, reliability and trustworthiness are the focus of the model jury charge adopted to implement Rule 3:17(e), which the court read to the jury. Anthony, 443 N.J. Super. at 570-71.

## III.

In points V through VIII, defendant alleges various instances of what he considers to be prosecutorial misconduct warranting a new trial.  Again, we disagree with defendant's arguments.

## A.

In point V, defendant contends he was deprived of due process due to prosecutorial misconduct in the State's grand jury presentation.  Specifically, he contends the prosecutor engaged in misconduct by permitting Detective Psaroudis to testify incorrectly before the grand jury that she issued Miranda warnings to defendant prior to his December 8, 2016 interview.

Detective Psaroudis's testimony before the grand jury included incorrect testimony that defendant was Mirandized before his second statement to the

police on December 8, 2016.[14]  At trial, Detective Psaroudis testified accurately that defendant was not re-Mirandized before his second police interview, and defense counsel questioned her about this and other errors in her grand jury testimony.  Moreover, in summation, defense counsel argued to the jury that Detective Psaroudis was not credible because she was "dangerous," "reckless," and "careless in the words she use[d]."  He argued she should not be believed because she had given false testimony both at the grand jury and at trial, saying things under oath that were "not true and accurate," and she had "a very cavalier, whatever, attitude towards it."

On his motion for a new trial, defendant raised the issue of Detective Psaroudis's false grand jury testimony.  However, the court denied the motion, noting defendant had never moved to dismiss the indictment on this basis.

We conclude the error in Detective Psaroudis's grand jury testimony does not present any grounds for reversing the post-trial judgment of conviction. Under Rule 3:10-2(c), grand jury issues must be raised before trial in order to preserve them for appeal, or they are deemed waived except upon a showing of good cause "because a guilty verdict is universally considered to render error in

---

[14]  The failure to re-issue Miranda warnings to defendant on December 8, 2016 was raised in a pretrial motion.

the grand jury process harmless." State v. Simon, 421 N.J. Super. 547, 551 (App. Div. 2011); United States v. Mechanik, 475 U.S. 66, 70 (1986). Defendant has not shown any good cause warranting a waiver of the requirement of a pretrial motion. See R. 3:10-2(c); see also State v. Allah, 170 N.J. 269, 282 (2002).

B.

In point VI, defendant contends he was deprived of due process based upon the prosecutor's eliciting false testimony from the detectives during the Miranda hearing. More specifically, he contends the prosecutor engaged in misconduct by presenting false testimony: (1) from Detective Hassloch, that on December 7, 2016, he had read the entire Miranda form to defendant, and defendant initialed the form; and (2) from either Detective Hassloch or Detective Psaroudis as to the timing of Detective Psaroudis's call to defendant's wife on December 8, 2016, since Detective Hassloch testified at the Miranda hearing that when he arrived at the prosecutor's office around noon on December 8, 2016, he observed Detective Psaroudis getting off the phone with defendant's wife, and Detective Psaroudis testified at trial that she spoke to defendant's wife at around 8:00 a.m. on December 8, 2016.

To the extent there were any errors or discrepancies in the testimony of the detectives, it was not an issue of prosecutorial misconduct. Rather, it constituted relevant inquiry for defendant's counsel to attack the detectives' credibility. To the extent this argument relates to the admissibility of defendant's statements to the police, we addressed that point in sections II and V.

### C.

In point VII, defendant alleges prosecutorial misconduct in summation that warrants a new trial. We have considered the passages from the prosecutor's summation, about which defendant complains, and find nothing objectionable. In light of the governing law, and defense counsel's failure to object, we find no basis for reversal. See R. 2:10-2; State v. Garcia, 245 N.J. 412, 435-36 (2021); State v. Williams, 244 N.J. 592, 606-07 (2021); State v. Frost, 158 N.J. 76, 82-83 (1999). On remand, however, there should be no references to the Reed advisory for the reasons discussed in section V of this opinion.

### D.

In point VIII, defendant contends his June 25, 2019 guilty plea was valid and factually supported by his allocution, and the State deprived him of due process by moving in bad faith to vacate it. We disagree.

On June 25, 2019, defendant agreed to plead guilty to third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), which was count three of his indictment, as amended. To establish defendant's guilt as to third-degree endangering the welfare of a child, the record must reflect that M.W. was a child, and defendant "engage[d] in sexual conduct which would impair or debauch the morals of the child." N.J.S.A. 2C:24-4(a)(1); Model Jury Charge (Criminal), "Endangering the Welfare of a Child, Sexual Conduct (Third Degree) (N.J.S.A. 2C:24-4(a)(1))" (rev. April 7, 2014).

The court accepted the plea, over the State's objection that it was not supported by defendant's factual admissions. That is, the record of the plea hearing reflects defendant's unwillingness to agree he engaged in sexual conduct that would endanger the morals of M.W.

First, in the allocution conducted by his counsel, defendant never admitted his conduct was sexual in nature; he admitted only that it was "considered" to be sexual. His attorney asked him: "Okay. And now, you agree, as we went over, that these acts are considered sexual conduct with your granddaughter and that these acts had the ability to impair or debauch her morals. You understand that, correct?"; and he responded "Yes."

When questioned further by the prosecutor and the court, it became clear defendant was not admitting his conduct was sexual in nature. That is, when the prosecutor asked him: "And all of those acts and contacts that you had with your granddaughter is sexual conduct under the law?," he responded: "Under the law it is, yes."

Further, upon questioning by the court, defendant explained he wrote the apology letter not because of his own conduct with M.W., but because he "had concerns about how [M.W.] was showing her affection to [him]," and he "felt that [he] had not addressed the behavior that was bothering [him]." When asked by the court about his own behavior, "[d]id you do something that you knew was wrong?," defendant responded: "The way I understand the law, . . . from what I've heard . . . [t]hen yes, sir, I do believe that I had done something wrong."

At that point both the prosecutor and the court expressed concern that the allocution was inadequate. Upon further questioning by the court and defense counsel, defendant still did not admit his conduct was sexual in nature. At most, he admitted he "pinched [his] granddaughter's butt" and he "would sit next to her and let [his] hand get too close to her genital area," and "these were things that I did that I knew were wrong." Nevertheless, the court was "satisfied with the factual basis."

A-0798-22

The State, however, maintained its position that the allocution was inadequate. The State then asked three additional questions of defendant, in which he finally admitted the sexual nature of his conduct with M.W.:

> Q. First, [defendant], based on what I'm interpreting as some ambiguity between what you said before and what you're saying now, do you acknowledge that you wrote that letter to your son and daughter-in-law because of your inappropriate behavior with your granddaughter, not your granddaughter's behavior?
>
> A. Absolutely, that's the reason, yes. I acknowledge that.
>
> Q. And you knew at the time when you were having this contact that you described before and I went over with you, that that contact with your daughter – your granddaughter was sexual when you were doing that contact, when you committed that act?
>
> A. Yes.
>
> Q. And you knew when you were touching her in that manner in that sexual contact that what you were doing was in fact wrong?
>
> A. Yes, I do.

After the hearing, the State filed a motion to vacate the plea, which the court granted. Explaining its ruling, the court began with a recitation of the plea hearing. The court characterized defendant's initial allocution as "in effect saying that the contact he had with his granddaughter was a

83

misunderstanding"—"that the contact was not sexual but incidental"—and that "obviously was not an adequate basis for the plea." However, by the end of the hearing, defendant had admitted to sexual conduct, and the court finalized the plea, believing the factual basis was sufficient.

The court thought the plea "could have survived but for what occurred at the Avenel investigation," where defendant denied culpability, denied any sexually motivated contact with M.W., and "returned to his" stance during the allocution "that this [was] a misunderstanding." While the court stated it "would like to be able to accept" defendant's contention that his allocution was sufficient, "the particular challenge here is that we really had to pull teeth . . . at the time of the plea. And then [the court] read the Avenel report . . . . And if you read the full report, [the court] think[s] it's fair to say that there was . . . a retreat." The court further explained:

> And just to make it clear, [the court is] granting the State's motion because [the court] think[s] it is, when you look at the entire transcript of the plea plus what occurred in the Avenel report, it is just cumulatively off the mark to consider us to have had, in a sense, a meeting of the minds and a true sincere plea allocution. It is unfortunate. But again, it was pulling teeth at the time of the plea and there was a renunciation, as [the court] see[s] it, before the Avenel examiners. And . . . that is, in the cumulative sense, I think sufficient to be a basis to grant the relief sought.

On his motion for a new trial, defendant argued, as he does on appeal, that the State moved in bad faith to vacate the guilty plea, and the court erred in granting the motion. The court rejected the argument and denied the motion, relying upon the earlier findings on the State's motion to vacate the plea.

Rule 3:9-2 provides, in pertinent part:

> A defendant may plead only guilty or not guilty to an offense. The court, in its discretion, may refuse to accept a plea of guilty and shall not accept such plea without first questioning the defendant personally, under oath or by affirmation, and determining by inquiry of the defendant and others, in the court's discretion, that there is a factual basis for the plea and that the plea is made voluntarily, not as a result of any threats or of any promises or inducements not disclosed on the record, and with an understanding of the nature of the charge and the consequences of the plea.

Thus, the Rule imposes three obligations on the court in accepting a guilty plea: (1) there is a sufficient factual basis for the plea; (2) the plea is voluntary, and (3) the plea "is given with a sufficient understanding of the nature of the charge and the consequences flowing from" it. State ex rel. T.M., 166 N.J. 319, 325 (2001). "The specificity and rigor embodied in Rule 3:9-2 manifest a systemic awareness that a defendant waives significant constitutional rights when pleading guilty, which places an affirmative obligation on a court to reject

A-0798-22

a plea of guilty when that court is not independently satisfied that the Rule's prerequisites are met."  Id. at 326.

Here, defendant's concern relates to the sufficiency of the factual basis of his plea.  "The requirement that there exist a factual basis for the plea serves a variety of purposes."  State v. Barboza, 115 N.J. 415, 421 (1989).  First, it protects the defendant, such that a determination is made that his admitted conduct satisfies the charge.  Ibid.  Obtaining an adequate factual basis for the plea ensures that an innocent person is not punished for a crime they did not commit.  Tate, 220 N.J. at 405.  Second, "[t]he factual-basis requirement also affords the court an opportunity to observe the conditions under which the plea is made, provides a better record for appellate review if the plea is subsequently challenged, increases the visibility of charge-reduction practices, and aids correctional agencies in the performance of their functions."  Barboza, 115 N.J. at 421; State v. Campfield, 213 N.J. 218, 230-31 (2013).

Thus, to accept a guilty plea, "the trial court must be 'satisfied from the lips of the defendant that he committed the acts which constitute the crime.'"  Barboza, 115 N.J. at 422 (quoting State v. Stefanelli, 78 N.J. 418, 439 (1979) (Schreiber, J., concurring)); Tate, 220 N.J. at 406.  "The factual basis for a guilty plea must obviously include defendant's admission of guilt of the crime or the

acknowledgement of facts constituting the essential elements of the crime." State v. Sainz, 107 N.J. 283, 293 (1987).

Although there is authority for the proposition that a court may look to the "surrounding circumstances" to determine whether there is an adequate factual basis for a defendant's plea, see, e.g., Barboza, 115 N.J. at 422, those cases "do not indicate that a court may look to sources that go beyond the actual facts, spoken or acknowledged, at the plea colloquy." Tate, 220 N.J. at 408. Thus, in Tate, the Court emphasized "the basic principle that the factual basis for a guilty plea must come directly from the defendant and not from informational sources outside of the plea colloquy." Ibid.

We apply a de novo standard of review when considering a decision on a motion to vacate a guilty plea for lack of an adequate factual basis. Id. at 403-04.

> An appellate court is in the same position as the trial court in assessing whether the factual admissions during a plea colloquy satisfy the essential elements of an offense. When reviewing the adequacy of the factual basis to a guilty plea, the trial court is not making a determination based on witness credibility or the feel of the case, circumstances that typically call for deference to the trial court. In short, if a factual basis has not been given to support a guilty plea, the analysis ends and the plea must be vacated.
>
> [Id. at 404 (citation omitted).]

Applying these principles to the facts of the instant matter, the court arguably erred in considering defendant's subsequent, exculpatory statements at the Avenel interview, outside the plea colloquy, in determining whether he had allocated to an adequate factual basis for his plea. Id. at 408. But see State v. Perez, 220 N.J. 423, 435-36 (2015) (relying upon content of text messages, which defendant admitted in plea colloquy to authoring and sending to victim, to support guilty plea to child luring). While the Avenel statements are statements made by defendant, the statements were not taken in the context of the plea allocution, and thus with an understanding of the consequences that flowed from them. Moreover, the Avenel statements are not part of the appellate record, so they cannot be reviewed by our court.

Nevertheless, solely considering defendant's statements at the plea colloquy, and applying our de novo standard of review, the record supports the court's decision to grant the State's motion to vacate. At the plea hearing, defendant did not admit to all elements of endangering the welfare of a child through sexual conduct. Defendant admitted only to pinching M.W.'s "butt" and sitting close to her and letting his hand get too close to her genital area. He never admitted how this conduct was "sexual conduct" because he never admitted a sexual motivation for or sexual gratification from engaging in the

conduct or that the conduct would impair or debauch the morals of the child. T.M., 166 N.J. at 333-36; State v. Smullen, 118 N.J. 408, 409 (1990).

At best, defendant was equivocal on this point:  first he admitted his conduct was considered sexual "under the law"; then he denied he did anything sexual, and his concern was about M.W.'s behavior towards him; finally he admitted his conduct was sexual, however, he did not specify what conduct was sexual or how it was sexual or how it was harmful to M.W.

The law recognizes that "[s]ome defendants . . . may find it difficult to speak at length on any subject let alone in a courtroom.  The nature of the offense may also inhibit a recitation of the facts of a particular charge." Perez, 220 N.J. at 435-36.  However, "[n]o matter how difficult, an adequate factual basis must be provided." Id. at 436.

The present record does not reflect a defendant who had overcome the natural reluctance to elaborate on the details of his behavior and had accepted the "distasteful reality" that made the charged conduct criminal. Tate, 220 N.J. at 407; Campfield, 213 N.J. at 231; T.M., 166 N.J. at 334-35.  He did not admit the sexual conduct element of the crime to which he was pleading guilty. N.J.S.A. 2C:24-4(a)(1).  As such, we find no prosecutorial misconduct in the

State's motion to vacate the plea, and no error in the court's order granting the motion.

E.

In point IX, defendant contends the State denied him his right to a timely telephone call after his arrest, thereby depriving him of his right to counsel. Defendant raised this issue for the first time in his motion for a new trial.

The record reflects that defendant was arrested on the evening of December 7, 2016, and issued his <u>Miranda</u> warnings at 7:27 p.m. He subsequently waived his rights and spoke to the detectives. After his interrogation, defendant was provided with an opportunity to make a phone call, and he chose to call his wife. However, their call was cut off, so on the drive over to the jail defendant asked Detective Psaroudis to call his wife on his behalf, and she did so the following morning. Further, on the morning of December 8, defendant's wife retained an attorney (Liuzza) on his behalf, and that attorney contacted the SCPO. On this record, defendant was provided with a timely phone call on December 7, 2016, and any difficulty with that call being disconnected did not result in a denial of his right to counsel, nor the ability of defendant's family to retain counsel on his behalf.

A-0798-22

IV.

In point X, defendant contends the court abused its discretion in granting the State's fresh complaint motion as to the statements made by M.W. to A.W. at Ginnie's House because her statements about bladder pain were not related to sexual abuse. We disagree.

Before trial, the State moved to admit M.W.'s statements to A.W. under both the fresh complaint and tender years exceptions to the rule against hearsay. The court held a N.J.R.E. 104 hearing, taking testimony from A.W. and also hearing argument from counsel. The court granted the State's motion under both hearsay exceptions.

Supporting this ruling, the court found: defendant was apprised of the State's intent to use the statements and had an opportunity to defend against such use; M.W. was under the age of twelve; M.W. had a relationship of trust with her mother, to whom she made the timely disclosure; it was anticipated M.W. would testify at trial; and M.W.'s statement about her bladder pain "generally is being ascribed to allege sexual misconduct committed against a child," although "[i]t remains to be determined by a jury whether or not the actual sexual misconduct that's asserted occurred." Thus, the court concluded: "There is really no indication as to why the [c]ourt should not find that based upon the

time elements, the content, the circumstances, that the statement bears all of the badges and indicia of trustworthiness."

We review evidentiary rulings for an abuse of discretion. State v. Burney, 255 N.J. 1, 20 (2023) (quoting Garcia, 245 N.J. at 430 (2021)). "A court abuses its discretion when its 'decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020) (internal quotation omitted)). In other words, to warrant reversal, the decision must reflect a clear error of judgment. State v. Nantambu, 221 N.J. 390, 402 (2015).

The New Jersey Rules of Evidence generally prohibit the admission of "hearsay," N.J.R.E. 802, which is defined as statement "the declarant does not make while testifying at the current trial or hearing," and that "a party offers in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). However, hearsay may be admitted if it falls within the tender years exception to the rule against hearsay, N.J.R.E. 803(c)(27), which provides:

> A statement made by a child under the age of [twelve] relating to sexual misconduct committed with or against that child is admissible in a criminal . . . case if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide

the adverse party with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of Rule 601.

With respect to the fresh complaint exception, it is a common law exception to the rule against hearsay that "allows the admission of evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015). "In order to qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support." Ibid. "These requirements are relaxed when they are applied to juvenile victims." Ibid. Whether proposed evidence satisfies the requirements for admission under the fresh complaint doctrine is left to the sound discretion of the trial court. State v. C.W.H., 465 N.J. Super. 574, 600 (App. Div. 2021).

Under this exception, however, "[o]nly the facts that are minimally necessary to identify the subject matter of the complaint should be admitted." R.K., 220 N.J. at 456. Thus, the court should not permit cumulative fresh complaint evidence. State v. Mauti, 448 N.J. Super. 275, 282-83 (App. Div. 2017).

Moreover, fresh complaint testimony may not be used to corroborate the victim's allegations of abuse. R.K., 220 N.J. at 456. "Therefore, the trial court is required to charge the jury that fresh-complaint testimony is not to be considered as substantive evidence of guilt, or as bolstering the credibility of the victim; it may only be considered for the limited purpose of confirming that a complaint was made." Ibid.

M.W.'s statements to her mother about the bladder pain she was experiencing satisfy both the tender years exception, N.J.R.E. 803(c)(27) and State v. Coder, 198 N.J. 451, 465-69 (2009), and the fresh complaint exception, R.K., 220 N.J. at 455, as they are arguably related to the sexual abuse alleged against defendant, and they were used to negate any argument that M.W. did not make a prompt complaint. Moreover, the court issued the required charge about the limited use of the evidence. As such, we conclude the court did not abuse its discretion in admitting M.W.'s statements to A.W.

A-0798-22

V.

In points IV and XVI, defendant contends the State violated its obligations under Reed, 133 N.J. at 237, and also that he was deprived of counsel in violation of the Sixth Amendment.  For the reasons that follow, we conclude the State violated the principles discussed in Reed and, for the reasons detailed infra, conclude defendant's judgment of conviction must be reversed and his December 8, 2016 statement suppressed at any retrial.

On December 7, 2016, according to Detective Psaroudis, during the ride to the Sussex County Jail, defendant said that his phone call to his wife had been disconnected, and he asked for an officer to contact her to advise her of the charges against him, where he would be lodged, and where to find his truck. Detective Psaroudis made that call the following morning.  She testified she gave defendant's wife the information requested, and also told her that an emergent hearing would be held later that day.  She further testified that she called defendant's wife a second time, later in the morning, to tell her that the emergent hearing had been moved to the following day.

As noted, due to the recording issues during defendant's December 7, 2016 interview, the detectives and Assistant Prosecutor Pappas agreed defendant should be reinterviewed on December 8.  Detective Psaroudis testified "[a]t

95

some point prior to my arrival to the jail I had another conversation with Assistant Prosecutor . . . Pappas, and she stated that she was aware the family was looking for an attorney as one had contacted her asking some questions about the case." However, Detective Psaroudis could not recall the name of the attorney, and she did not recall whether Assistant Prosecutor Pappas ever mentioned the attorney's name.

Detective Hassloch's recollection was somewhat different. When questioned about his knowledge of defendant's representation by an attorney, Detective Hassloch testified as follows:

> Q. At that point when you went to go interview [defendant] at the jail, did you have any information about a potential attorney for the defendant?
>
> A. No potential attorney at the time.
>
> Q. Was there any discussion about the family obtaining an attorney?
>
> A. As I recall, the family was in the process of looking for an attorney, but they had not retained one yet.

However, Detective Hassloch believed Detective Psaroudis obtained this information from a phone call with defendant's wife. That is, Detective Hassloch did not recall Assistant Prosecutor Pappas mentioning the potential of defendant having an attorney. He recalled when he arrived at the Prosecutor's

A-0798-22

Office at around noon on December 8, Detective Psaroudis "was just getting off the phone with" defendant's wife, and during the phone call she had told Detective Psaroudis "that she was in the process of looking for an attorney."

Further, unlike Detective Psaroudis, Detective Hassloch specifically recalled that "at some point there was a discussion of . . . Liuzza," as defendant's counsel. However, he did not recall "exactly when that was during this whole process."

Both Detectives Hassloch and Psaroudis testified that Assistant Prosecutor Pappas advised the officers to issue a Reed advisory to defendant, "to be on the safe side," "as just an extra precaution." Detective Hassloch recalled Detective Psaroudis bringing a Reed advisory form with her to the interview.

For his part, Liuzza testified that on the morning of December 8, 2016, defendant's wife called his office and spoke with someone on his staff. Thereafter, shortly after 10:00 a.m., as he was driving to a dentist appointment, his secretary called him and advised him of the call. He understood that: defendant had criminal charges pending against him; he was held in the county jail; and defendant's wife was interested in retaining Liuzza to represent defendant "for the purpose of attending the emergent bail hearing, which was

97

originally scheduled for that same day," at about 1:30 or 2:00 p.m.  Liuzza further testified there was no retainer in place at that time and he had no prior relationship with defendant.

After ending that phone call, at about 10:30 a.m., and while still on his way to the dentist appointment, Liuzza called the SCPO and spoke with Assistant Prosecutor Pappas.  He testified "[t]he purpose of [his] call was to find out which Assistant Prosecutor was assigned to the case . . . and then to discuss the case with whichever Assistant Prosecutor was assigned to it to see if [he] could learn more about the allegations and perhaps find out what the State's position would be prior to [him] attending any emergent hearing in the afternoon."  Asked whether the purpose of the phone call was "to get information to find out if [he was] interested in handling the case," Liuzza responded, "[n]o., candidly it was to find out what type of retainer [he] should request from the client."

Liuzza further testified that in speaking with Assistant Prosecutor Pappas, he

> told her that [he] had been called by [defendant's] wife, that [he] was on [his] way to the dentist and that when [he] got out of the dentist [he] was going to go straight to the jail to meet with [defendant], and that if [defendant] had retained [him], [he] intended to go to the emergent hearing at 1:30 or 2 p.m.

He further testified he "was going to the jail regardless of whether or not [he] received a retainer."

Between 11:30 a.m. and noon, shortly after he left the dentist's office, Liuzza personally spoke with defendant's wife. He testified she retained him to attend the emergent hearing. However, he could not recall exactly when the retainer fee was paid. As best he could recall, the payment was made "close in time to [his] going over and seeing [defendant] at the jail," later that afternoon.

After his phone call with defendant's wife, at 12:07 p.m., Liuzza received a text message from Assistant Prosecutor Pappas, advising him the emergent hearing had been moved to the following day. He responded about half an hour later, thanking her for the information.

In the meantime, Liuzza's office had been in touch with the jail, "and they said it was better to come after 3 o'clock because they were locked down . . . for a shift change around that time." Accordingly, Liuzza met with defendant at the jail at about 3:15 p.m.

Assistant Prosecutor Pappas testified that on December 8, 2016, after discussing a re-interview of defendant with Detectives Psaroudis and Hassloch, she received a call from Liuzza. She explained:

A-0798-22

[S]hortly after we discussed that, I received a phone call from a defense attorney . . . Liuzza, and we . . . discussed the case and he had indicated that he was considering representing [defendant], that someone had reached out for him and he wanted to know what the facts of the case were, what the type of case was, was it something that he should take or not take, which is a common practice in a small bar like Sussex County where everybody knows everybody. And so I explained it to him, and he at that point had said well, do you know when the emergent is, and I said I'm not really sure, I'll let you know though if I find out, out of courtesy, whether you represent him or not. And it was a very short conversation and it ended. And at that point I spoke with Detective Psaroudis and advised her that given the circumstances we should probably err on the side of caution and just give [defendant] a <u>Reed</u> advisory and explain to him that someone had reached out for him and was possibly thinking about representing him. We don't really have any more information, but just to be on the safe side, let's at least advise him of that.

Assistant Prosecutor Pappas testified Liuzza did not say anything about being formally retained on the case, and she "did not come to a conclusion either given the time." She further explained this testimony, stating:

I think it was 10:45, 10:30 in the morning, I knew that [defendant] had been arrested and lodged later in the evening and that he was from another state, so I did not in any way even assume that . . . Liuzza had any time to meet with the family or be retained and nor did he say that.

Assistant Prosecutor Pappas did not recall the exact words Liuzza used. However, she could "imagine–the conversation was about him representing [defendant], whether it be for the emergent or overall." In her mind: "It was more him inquiring of me what the facts of the case were, how serious were the charges, was it going to be a time-consuming case"; and this inquiry "was more for him to decide whether or not is this something that he should actually accept . . . [a]nd maybe how much to charge." She knew at the time of her phone call with Liuzza the detectives would be interviewing defendant for a second time that day but she did not tell Liuzza about the planned interview.

As for her advice to Detective Psaroudis about the <u>Reed</u> advisory, Assistant Prosecutor Pappas testified that she did not believe a <u>Reed</u> advisory was necessary under the circumstances. However, she recommended Detective Psaroudis issue one because she wanted to err on the side of caution. She also did not recall telling Detective Psaroudis the name of the attorney who had called her and said she "probably didn't even go over the name with her." Instead, she "said just put the family is trying to locate one," although she "really [did not] have a direct recollection."

Assistant Prosecutor Pappas also recalled later sending a text message to Liuzza, advising him that the emergent hearing had been moved to the following day. There is no explanation in the record as to why the hearing was postponed.

At the December 8 interview, Detective Psaroudis filled out the Reed advisory form and she reviewed it with defendant, after which he agreed to speak with the detectives. The Reed advisory form is dated December 8, 2016, at 12:40 p.m., and is signed by defendant, Detective Psaroudis, and Detective Hassloch. It does not mention Liuzza. Instead, in the place for "Name of Attorney," Detective Psaroudis wrote "[f]amily is trying to locate atty," and after speaking with defendant, Detective Psaroudis checked the box for "[a]t this time, I do not wish to consult with an attorney and wish to continue the interview (interrogation)."

Detective Psaroudis's colloquy with defendant relating to the Reed advisory reads as follows:

> Det. Psaroudis: (clears throat) Alright so like I said I spoke with [defendant's wife] earlier and you know, I'll tell her, tell you what she said. I have to go over this form with you though, okay? It's a Reed advisory. (coughs) . . . I'm gonna put your name . . . 12/8/16. Do you have the time?
>
> Det. Hassloch: It's 20 of 1.

Det. Psaroudis: Okay . . . (background noise) . . . okay, it just says that I'm informing you that um, I spoke with your family and they're trying to find you an attorney, okay? So it's up to you if you would like to speak with us or not, okay? And it says I understand that I have a right to speak with, we don't have a name yet, but they're trying, with an attorney and to have him or her present during this interview. And I also understand that I have the right to stop the interview at any time to consult with this or any other attorney. No promises or threats have been made to me and no pressure or force of any kind has been used against me. Do you want to speak with us?

(Background voices)

[Defendant]: Yeah.

Det. Psaroudis: It's up to you sir, you do?

[Defendant]: I mean what, what you're charging me with are very serious charges. I've never been through this before.

Det. Psaroudis: Mhmm. I understand (voices overlap)

[Defendant]: And I don't know anything about it, (mumbles) . . . It's not that I don't feel horrible about what's happened . . . .

Det. Psaroudis: Mhmm.

[Defendant]: But I don't know . . . what would happen, what's gonna happen next.

Det. Psaroudis: Mhmm.

103

[Defendant]: Am I looking at a prison sentence of years, am I looking at what am I looking at? (indiscernible)

Det. Psaroudis: Well we don't know yet. It's early into this whole process, you know. Um, I know once you do have an attorney, they speak with the Prosecutor and they kind of, and they kind of try to work something out, you know. I don't know, I can't give you an answer of what is going to happen, that's not my job. I don't know.

[Defendant]: I, I'll speak with you. I mean I've got nothing to hide. Um. (coughs)

Det. Psaroudis: Okay so at this time I do not wish to consult an attorney, I wish to continue with the interview. Just sign here . . . so I know you've never been in trouble like this before so you know, we want to make sure that you're okay and if you have any questions we can kind answer some (indiscernible).

[Defendant]: I (indiscernible), I don't know how long I'm gonna be here for . . .

Det. Psaroudis: Mhmm.

[Defendant]: Or what are the chances of getting out, what, you know. (mumbles) Nobody's said anything to me.

Det. Psaroudis: Well usually once you're lodged, you have an emergent hearing. Um, that's within, it's either gonna be today or tomorrow. I think they moved it to tomorrow, I don't think the judge does emergents on Thursday. So tomorrow you go before a judge, and they ask you if your gonna retain an attorney or if you want a public defender and they also um, you know, your bail

104

A-0798-22

may go down or it may stay the same and at that time you can kind of gauge whether or not you can make bail, okay? And um . . .

[Defendant]: And how is bail posted?

Det. Psaroudis: Well you can possibly go to a bail bondsman and work it out that way, you know. You'd need like cash, I would imagine, so . . . but . . . that's something that can be . . .

[Defendant]: I mean at what he set bail last night there's no way. I'll be here the rest of my life. You know, I can't pay that.

Det. Hassloch: No?

Det. Psaroudis: But the judge could change it, or the judge could add a [ten] percent option . . . okay? I mean you don't have any criminal history so that could, you know that's going to help and you've been cooperative. Um, you know obviously you had the night to think, we just didn't know if you remembered anything else about the incident that could help [M.W.]

At the end of the interview, Detective Psaroudis discussed with defendant her communications with his wife, and defendant's experiences in the jail. Detective Psaroudis told defendant that his wife is "trying to find you an attorney," and defendant then asked: "So since I don't have an attorney, the difference between aggravated and?" Detective Psaroudis responded by explaining the difference between the three charges and their factual bases, and stated "at some point you will have an attorney and they're gonna work with the

105

Prosecutor . . . and you either reach a plea deal or it goes to trial someday." "So those are choices you're gonna have to make."

The following day, December 9, 2016, a pretrial detention hearing was held. At the hearing, defendant was represented by Liuzza.

As noted in point XVI, defendant argues the December 8, 2016 statement should have been suppressed based upon the State's violation of Reed, 133 N.J. at 237, and in his point IV he contends the failure to comply with Reed violated his right to counsel under the Sixth Amendment to the United States Constitution, and Article I, paragraph ten of the New Jersey Constitution.

As noted, in reviewing a trial court's ruling on a motion to suppress, we must defer to the court's factual findings if those findings are supported by sufficient credible evidence in the record. Bullock, 253 N.J. at 532. We review the court's legal conclusions de novo. Ibid.

In Reed, 133 N.J. at 263-65, 268-69, the Court held the State had a "narrow and specific" duty to inform a person in custody about the existence of counsel who is available to represent them, and the failure to do so would result in the per se exclusion of any statement taken after violation of this duty. In its own words, the Court held:

> The duty to inform, that we place upon the State, is narrow and specific. It arises only where counsel has

made known that he or she has been retained to represent the person held in custody, is present or readily available, and makes a request to consult with the suspect in "a reasonably diligent, timely and pertinent" fashion. We do not make incumbent upon the attorney the duty to communicate directly [with] the interrogating officers. That communication will not, most times, be possible. Rather, whenever the attorney has communicated his presence and desire to confer with the suspect to an agent of the State in a position to contact the interrogating officers, we will impute to those officers knowledge of the attorney's presence and desire to confer with the suspect. Thus, the police need do no more than receive and convey what has already been communicated: that an identified attorney retained for a person in custody is available to assist that person if he or she requests such assistance.

The standard that we adopt today declares certain police acts or omissions to invalidate a suspect's waiver of the privilege against self-incrimination.

[Id. at 263-64 (citation omitted).]

Accord Cook, 179 N.J. at 551.

In addressing defendant's pretrial motion to suppress his December 8 statement, the court held the police had no obligation to issue a Reed advisory because the State was not aware Liuzza had been formally retained to represent defendant. According to the court's understanding of the record, the State was aware only "that [d]efendant's family was attempting to find attorney representation for [him]," and of Liuzza's "potential representation" of

defendant.  See Cook, 179 N.J. at 551 (a "key element" to the holding in Reed "was that an attorney-client relationship existed between the defendant and the attorney").

However, the court's holding was based upon:  a misunderstanding of how Reed applied given the facts established at the pretrial hearings; as well as a misunderstanding of the factual record developed at the pretrial hearings.  That is, the record reflects that on the morning of December 8, 2016, defendant's wife called Liuzza's office to retain him, and Liuzza agreed to meet with defendant and represent him at the emergent hearing.  These facts were sufficient under Reed, 133 N.J. at 261-62, to establish that defendant's wife retained Liuzza, and that an attorney-client relationship existed between defendant and Liuzza, notwithstanding Liuzza's testimony that at that point in time there was no formal retainer agreement in place.

The record further reflects that upon his retention, Liuzza called the SCPO and spoke with Assistant Prosecutor Pappas about his plan to meet with defendant and appear at the emergent hearing.  At the pretrial hearing, Liuzza was asked whether the purpose of the phone call to Assistant Prosecutor Pappas was to decide whether he was "interested in" handling defendant's case.  He said no.  He testified the purpose of the phone call was to determine how much of a

retainer he should request. Thus, in Liuzza's telling of events, he had the sort of attorney-client relationship recognized by <u>Reed</u>, 133 N.J. at 261-62.

Significantly, the trial court misunderstood this aspect of the record, stating in its opinion:

> [T]he conversation between . . . Liuzza and Assistant Prosecutor Pappas was in furtherance of . . . Liuzza's general <u>interest</u> in being retained and the possibility that he <u>may</u> be retained; he had not been, at that point, formally retained, according to his recollection and according to the understanding of the Assistant Prosecutor and [d]etectives.
>
> [(Emphasis added).]

Also contrary to the court's understanding of the record, Liuzza communicated his attorney-client relationship to Assistant Prosecutor Pappas. He testified he told Assistant Prosecutor Pappas he would be meeting with defendant and, if retained by him, he would attend the emergent hearing that afternoon (scheduled for just a few hours after their phone call). That information was sufficient for Liuzza to have communicated his attorney-client relationship for the purposes of <u>Reed</u>, 133 N.J. at 241, 260-61.

Further, Assistant Prosecutor Pappas's testimony regarding her phone call with Liuzza was factually consistent with Liuzza's testimony. She testified to her understanding that Liuzza had been contacted by someone on defendant's

behalf, and he asked about the facts of the case, as well as the scheduled time for the emergent hearing. While she could not recall the exact words he used, Assistant Prosecutor Pappas understood the conversation was generally about whether he should take the case and the possibility of him representing defendant, "whether it be for the emergent or overall."

She further testified that she did not come away from the phone call believing Liuzza had been formally retained by defendant. However, Assistant Prosecutor Pappas based that belief upon the fact Liuzza could not yet have had the time to meet with defendant's family since defendant had just been arrested and lodged the night before.

Regardless, she provided Liuzza with the information he had requested about the scheduling of the emergent hearing, sending him a text message that advised him the emergent hearing had been postponed to the following day, and saying she did so "out of courtesy." In addition, indicating some understanding of her obligations under Reed, she advised the detectives to issue a Reed advisory to defendant, albeit not one that provided defendant with Liuzza's name; and she said she did so "just to be on the safe side."

Contrary to the court's ruling, this record is sufficient to establish knowledge on the part of the State of a presently existing attorney-client

110

relationship between defendant and Liuzza, which warranted a valid <u>Reed</u> advisory.  That is, there was no need for a formal retainer agreement or financial payment for the attorney-client relationship to exist, nor was it necessary for Liuzza to have met with defendant or his wife.

Those exact arguments were rejected by the Court in <u>Reed</u>, 133 N.J. at 260-61.  No retainer agreement existed in <u>Reed</u>.  <u>Ibid.</u>  Rather, as here, one purpose of the attorney meeting with the defendant would be for the defendant to decide whether to retain the attorney, and for the attorney to "decide whether to represent defendant . . . ."  <u>Id.</u> at 241.

Moreover, as here, the defendant in <u>Reed</u> had never requested an attorney, nor had he ever met with the attorney procured on his behalf.  <u>Id.</u> at 260. Nevertheless, the Court held that an attorney-client relationship existed.  <u>Id.</u> at 261.

The Court stated:

> An attorney-client relationship between a suspect held in custody and an attorney . . . need not depend on a specific request by the suspect for representation by that attorney.
>
> <u>We are satisfied that an attorney-client relationship should be deemed to exist under such circumstances between the suspect and an attorney when the suspect's family or friends have retained the attorney</u> or where the attorney has represented or is

A-0798-22

representing the suspect on another matter. <u>When, to the knowledge of the police, such an attorney is present or available, and the attorney has communicated a desire to confer with the suspect, the police must make that information known to the suspect before custodial interrogation can proceed or continue. Further, we hold that the failure of the police to give the suspect that information renders the suspect's subsequent waiver of the privilege against self-incrimination invalid per se.</u>

[<u>Id.</u> at 261-62 (emphasis added).]

With respect to the issue of whether Liuzza made a timely request to confer with defendant, Liuzza testified he spoke with Assistant Prosecutor Pappas at 10:30 a.m., which was over two hours before defendant's interview began at 12:40 p.m. Further, he testified he told Assistant Prosecutor Pappas of his plan to "<u>go straight to the jail to meet with</u> [defendant]" when he got out of his dentist appointment, and he left the dentist between 11:30 a.m. and noon. (emphasis added). Thus, according to Liuzza's testimony, he advised Assistant Prosecutor Pappas of his plan to consult with defendant in a "'diligent, timely and pertinent' fashion." <u>Id.</u> at 264 (quoting <u>State v. Stoddard</u>, 537 A.2d 446, 454 (Conn. 1988)).

The importance of Liuzza's timely request to speak with defendant is further exhibited by the clear concerns defendant expressed regarding the charges he was facing. Deprived of the fact counsel had been retained and

112

planned to meet with him later that day, defendant asked Detective Psaroudis a number of questions that were more properly directed towards his counsel. For example: "Am I looking at a prison sentence of years, . . . what am I looking at?"; "what are the chances of getting out"; "[s]o since I don't have an attorney, the difference between aggravated and?"; and "how is bail posted?"

For her part, Assistant Prosecutor Pappas did not provide any testimony on Liuzza's plan to meet and confer with defendant at the jail, nor was she questioned on this issue. However, as of 10:30 a.m., she knew of Liuzza's plan to meet with defendant and attend the emergent hearing, which was scheduled for only a few hours later (at 1:30 or 2:00 p.m. that afternoon, according to Liuzza).

Thus, we conclude the factual record before us was sufficient to establish that Liuzza had been retained by defendant's family and he had made a request to consult with defendant in a reasonably diligent and timely fashion, such that a <u>Reed</u> advisory was required. Indeed, that appears to have been the conclusion reached by Assistant Prosecutor Pappas herself, notwithstanding her testimony to the contrary. The very fact she counseled Detective Psaroudis to issue a "watered-down" <u>Reed</u> advisory reflects Assistant Prosecutor Pappas's understanding of the significance of Liuzza's phone call. However, the advisory

 A-0798-22

issued did not comply with <u>Reed</u> because the officers did not advise defendant that counsel had been retained and had made a request to speak with him.

While we acknowledge this case does not involve the chicanery at issue in <u>Reed</u>, we nonetheless conclude the police's failure to advise defendant of Liuzza's retention and his effective request to speak with him when he indicated he would "go straight to the jail to meet with [defendant]," violated the principles our Supreme Court stressed in <u>Reed</u>. As the <u>Reed</u> Court explained, "[t]he most significant consideration behind the rule is that the duty to inform a person held in custody of a specific opportunity to confer with a known lawyer is closely connected, both in logic and in experience, to the full effectuation of the privilege against self-incrimination." <u>Id.</u> at 266. Based on the facts elicited at the suppression hearing, including the testimonies of the interrogating officers, we are satisfied defendant's rights against self-incrimination were violated.

Finally, we note for the purposes of <u>Reed</u>, it is irrelevant whether the detectives knew Liuzza's name–another point on which the record is unclear. Under <u>Reed</u>, it is sufficient that Pappas was aware of Liuzza's name, because her knowledge is imputed to the officers. 133 N.J. at 264.

114

As such, we are satisfied the court erred in denying defendant's motion to suppress his December 8, 2016 statement to the police, which was taken in violation of the State's obligation under <u>Reed</u>.[15]  As a result of our holding, we decline to address defendant's argument based upon his constitutional right to counsel, because it is unnecessary to do so.  <u>State v. Crawley</u>, 187 N.J. 440, 451 (2006); <u>State v. Zucconi</u>, 50 N.J. 361, 364 (1967).  We note only that in <u>Reed</u>, 133 N.J. at 263, the Court expressly declined to address the issue as one under the Sixth Amendment to the United States Constitution, or Article 1, Paragraph 10 of the New Jersey Constitution.  And the <u>Reed</u> decision is itself a departure from jurisprudence under the federal constitution.  <u>See</u> <u>Moran v. Burbine</u>, 475 U.S. 412 (1986).

## VI.

In point XVII, defendant contends the court erred by limiting the defense expert's testimony in violation of defendant's due process rights and his right to present a defense.  We agree.

---

[15]  Because we are satisfied the clear violation of <u>Reed</u> warrants suppression of the December 8 statement, we do not address whether the intervening events of the <u>Reed</u> violation and the failure to video record the December 8 statement, under the totality of the circumstances, required the interrogating officers to readminister <u>Miranda</u> warnings prior to questioning defendant.  <u>See</u> <u>State v. Dispoto</u>, 189 N.J. 108, 124-25 (2007).

We review evidentiary rulings for an abuse of discretion. Burney, 255 N.J. at 20; State v. Singh, 245 N.J. 1, 12-13 (2021). Typically, a trial court holds a hearing relating to the admissibility of expert testimony. State v. Torres, 183 N.J. 554, 567 (2005); Nantambu, 221 N.J. at 402. This allows for the court to thoroughly understand the disputed issues and creates a record for appellate review. Torres, 183 N.J. at 567. In this case, however, no such hearing was held.

As noted, defendant's retained expert, Del Russo, prepared an expert report in which he opined at length about Detective Psaroudis's failure to use best practices when forensically interviewing M.W. In particular, he opined that Detective Psaroudis omitted crucial steps of the Child First Finding Words protocol. He also opined that Detective Psaroudis used questioning that had "the capacity to significantly impact the reliability of . . . M.W.'s statements," including: (1) juxtaposing important lines of inquiry with fantasy narratives (e.g., M.W.'s toy bear and her elf on the shelf); (2) providing suggestive information from third parties that M.W. might not want to contradict; (3) continuing her inquiry after M.W. denied any inappropriate touches other than by a classmate; (4) using focused, direct, and highly suggestive questioning in which Detective Psaroudis sought agreement for her own narrative (e.g., that

116

M.W.'s pants were down); and (5) mischaracterizing M.W.'s statements and introducing notions on legally significant issues (e.g., that there had been skin-to-skin contact between defendant and M.W.'s vagina, and that defendant's fingers had penetrated M.W.'s vagina). Finally, Del Russo opined that Detective Psaroudis misused the anatomical dolls, failed to instruct M.W. the dolls were not playthings, and used the word "pretend" when communicating with M.W. about how to use the dolls.

The State moved in limine to exclude Del Russo's testimony, which defendant opposed. The court did not hold a Rule 104 hearing, but it heard argument from counsel. The court denied the motion to preclude but limited the scope of the expert's testimony. Specifically, the court ruled Del Russo could only describe the Child First Finding Words protocol to the jury and could not describe to the jury how Psaroudis violated the protocol, stating:

> Substantively, . . . Del Russo's expert report is replete with instances in which he opines on the credibility of both the child-witness and Detective Psaroudis. Under Michaels, expert trial testimony bearing on the issue of whether an individual child-witness's statements were truthful or reliable is not permitted. Introduction of . . . Del Russo's proposed testimony at trial must not impinge on the province of the jury to make ultimate determinations regarding witness credibility.
>
> However, the [c]ourt will limit the scope of . . . Del Russo's testimony at trial. As the State indicates,

the issue of the admissibility of the child-witness statements in this case was already decided by the Honorable William J. McGovern, III, J.S.C., on November 14, 2017. Judge McGovern conducted an extensive N.J.R.E. 104 hearing in relation to a tender years motion pursuant to N.J.R.E. 803(c)(27) and determined that, based on the testimony elicited at the hearing, the statement was admissible. Further, at that hearing, Judge McGovern reviewed the interview and the statements made therein himself and defense counsel was permitted to cross-examine Detective Psaroudis regarding that interview. One necessary finding included in Judge McGovern's decision is that, based upon the time, content, and circumstances of the interview and statement, such statement was trustworthy and reliable. See N.J.R.E. 803(c)(27). The [c]ourt will not overturn those findings, nor will it reopen the issue of the admissibility or reliability of the child-witness's statements.

Defendant may have . . . Del Russo testify as to the Finding Words/Child First protocol generally, its overall significance and theory, and any general issues with the protocol which may raise questions as to suggestiveness or the reliability of testimony elicited through its use. The expert may not address or opine as an expert as to the actual interview employed in this case or to the actions or statements of either the child witness or the interviewers. This shall not be interpreted to prohibit [d]efendant from cross-examination of these witnesses as to any interview. Defendant may still explore the possible unreliability of the child witness's testimony via cross-examination, but may not directly opine on that issue via the expert testimony of . . . Del Russo.

[(Emphasis added).]

Defendant took exception to this ruling, arguing it was erroneous. Nevertheless, Del Russo's testimony was limited pursuant to the court's ruling. We conclude the trial court's ruling was clearly erroneous because it was directly contrary to the facts. That is, contrary to the court's finding, Del Russo's report did not contain any instances in which he opined on the credibility of M.W. or Detective Psaroudis. In his report, Del Russo opined only upon Detective Psaroudis's failure to follow the Child First Finding Words protocol when interviewing M.W.

Furthermore, the trial court's ruling was directly contrary to controlling case law. That is, the court appears to have believed that its tender years ruling, admitting into evidence Detective Psaroudis's interview of M.W., somehow resolved the issue of reliability, such that defendant was not permitted to present expert testimony on the subject. However, the holding in Michaels, 136 N.J. at 323, is directly contrary.

In Michaels, 136 N.J. at 320, the Court held that in child sex abuse cases a pretrial hearing must be held to address "whether the pretrial events, the investigatory interviews and interrogations, were so suggestive that they give rise to a substantial likelihood of irreparably mistaken or false recollection of material facts bearing on defendant's guilt." "[T]he ultimate determination to be

made is whether, despite the presence of some suggestive or coercive interview techniques, when considering the totality of the circumstances surrounding the interviews, the statements or testimony retain a degree of reliability sufficient to outweigh the effects of the improper interview techniques." Id. at 321.

At the pretrial hearing, the parties are entitled to present expert testimony. Ibid. "However, the relevance of expert opinion focusing essentially on the propriety of the interrogation should not extend to or encompass the ultimate issue of the credibility of an individual child as a witness." Id. at 321-22.

> Finally, if it is determined by the trial court that a child's statements or testimony, or some portion thereof, do retain sufficient reliability for admission at trial, then it is for the jury to determine the probative worth and to assign the weight to be given to such statements or testimony as part of their assessment of credibility. Experts may thus be called to aid the jury by explaining the coercive or suggestive propensities of the interviewing techniques employed, but not of course, to offer opinions as to the issue of a child-witness's credibility, which remains strictly a matter for the jury.
>
> [Id. at 323 (emphasis added).]

The Court added that the jury's determination as to the credibility of the child's statements must be made "in light of all the surrounding circumstances, and without reference to the trial court's determination and ruling on admissibility." Ibid.

A-0798-22

Thus, notwithstanding the court's ruling on the admissibility of M.W.'s statement to Detective Psaroudis, defendant was permitted to challenge the reliability and credibility of that statement at trial, including through expert testimony. Ibid.; see also Crane v. Kentucky, 476 U.S. 683, 687-91 (1986) (holding defendant was permitted to present evidence relating to reliability and credibility of his statement to police, notwithstanding court's legal ruling on admissibility/voluntariness).

There is a distinction made between expert testimony relating to matters that affect the reliability of a witness's testimony, and expert testimony on the credibility of a particular witness. The former is permitted, whereas the latter is not. See, e.g., State v. Henderson, 208 N.J. 208, 297 (2011) (permitting expert testimony relating to eyewitness identification, but experts "may not opine on the credibility of a particular eyewitness").

The court's clearly erroneous ruling was also exceedingly prejudicial to the defense. M.W. made no disclosure of abuse other than in her interview with Detective Psaroudis. She made no prior disclosure of abuse, and she did not directly testify to any abuse at trial. Instead, she stated at trial defendant "touched [her] in [her] privates," but later clarified she did not "really remember." Thus, the reliability of M.W.'s statement to Detective Psaroudis

was crucial to the prosecution, and defendant should have had a full opportunity to contest it. Defense counsel's cross-examination of Detective Psaroudis, and his summation criticizing her interview were neither sufficient nor a valid replacement for an expert opining about the alleged errors in the interview. Id. at 296. In sum, we reverse and remand for a new trial based upon the court's abuse of discretion in limiting the testimony of defendant's expert.

## VII.

In point XVIII, defendant contends the court abused its discretion in admitting the videotape of M.W.'s statement to Detective Psaroudis. In light of our decision on defendant's expert and the court's misapplication of Michaels, as well as our concerns that the court did not address troublesome aspects of the forensic interview, on remand the trial court should reconsider the admission of M.W.'s statement to Detective Psaroudis by conducting a new hearing under N.J.R.E. 104.

Defendant contends the court abused its discretion in admitting the videotape of M.W.'s statement to Detective Psaroudis under the tender years exception to the rule against hearsay, N.J.R.E. 803(c)(27), because the statement was untrustworthy, and he could not meaningfully cross-examine M.W., who at

122

trial testified that she had no recollection of the videotaped statement or the alleged abuse.

Before trial, the State moved to admit the video recorded statement M.W. gave to Detective Psaroudis under the tender years exception. The court held a hearing under N.J.R.E. 104, taking testimony from Detective Psaroudis, hearing argument from counsel, and considering the videotaped statement.

The court granted the State's motion, finding that all necessary components of the tender years exception to the rule against hearsay, N.J.R.E. 803(c)(27), had been satisfied. Specifically on the issue of trustworthiness, which was the focus of defense counsel's argument against admission of M.W.'s statement, the court based its ruling on its own review of the video recording.

First, the court found "M.W. had the mental capacity to conceptualize and organize events within a timeframe." Next, the court found "the interview setting and rapport occurred in the absence of coercion and suggestive questioning" and "M.W.'s statement was voluntary, detailed, and consistent in its descriptions of the conduct described." On this point, the court also found Psaroudis "established a rapport with M.W. that allowed for ease of conversation and natural back-and-forth," and "M.W. freely supplied her personal account of

123

the events she experienced, absent leading, manipulative, or coercive questions that could taint the reliability and trustworthiness of the statements."

Next, the court found the absence of a motive for M.W. to fabricate, and "M.W.'s statement and the manner in which she conversed with Detective Psaroudis [were] not indicative of fabrication or rehearsed content." The court found nothing to suggest M.W. was "compelled, coached, or instructed to share information with Detective Psaroudis," and the court cited passages from the transcript of the statement in support of this conclusion, including examples of M.W.'s use of age-appropriate language, her lack of understanding about the implications of her disclosures, and her consistent and detailed descriptions of the alleged abuse, albeit interspersed with "spontane[ity] in her tangents."

The court concluded its discussion of trustworthiness with the following:

> The [c]ourt notes the consistency and clarity with which M.W. identified and disclosed the details of [d]efendant's conduct; the comfort and rapport established between Detective Psaroudis and M.W., allowing for detailed, at times proactive, trusting, and engaged conversation; and the lack of any indication that M.W.'s statement was rehearsed, fabricated, or planted through leading questions or an otherwise exterior source. This [c]ourt finds that based on the totality of the circumstances, "on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy," as is required under N.J.R.E. 803(c)(27). Therefore, the

124

fourth requirement of the "tender years" exception to the hearsay rule is met.

Finally, the court held that the videotaped statement was admissible as a writing defined by N.J.R.E. 801(e), and as a past recollection recorded under N.J.R.E. 803(c)(5).

At trial, defendant made a renewed motion to exclude the interview with Detective Psaroudis, arguing he did not have an opportunity for meaningful cross-examination of M.W. since she did not recall what had happened and had no recollection of the forensic interview. The court denied the motion because it found M.W.'s trial testimony was sufficient to satisfy N.J.R.E. 803(c)(27) in that "[a]lthough she did not remember specific details, she remembered that [d]efendant touched her private parts in the bathroom of her residence and that she had fun with [d]efendant during the weekend in question, and therefore had 'memory of the subject matter.'" Thus, M.W. was not unavailable under N.J.R.E. 804(a)(3).

The court further found defendant's right of confrontation was not infringed upon because defense counsel was able to cross-examine M.W. notwithstanding her memory lapses. The court stated:

> Defense counsel's decision not to go beyond the most basic questions . . . also leads to the alternate conclusion that he chose not to directly confront the

125

child with respect to claims made in her videotaped statement. When that happens, a court cannot conclude that the right to confrontation was curtailed based on the witness's direct testimony or inability to respond to tangential questions.

As noted, we review evidentiary rulings for an abuse of discretion. Burney, 255 N.J. at 20 (quoting Garcia, 245 N.J. at 430).

As noted, hearsay may be admitted if it falls within the tender years exception to the rule against hearsay, N.J.R.E. 803(c)(27), which provides:

> A statement made by a child under the age of [twelve] relating to sexual misconduct committed with or against that child is admissible in a criminal . . . case if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide the adverse party with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of Rule 601.

The only issues presented are with respect to the second and third parts of the test for admissibility: the trustworthiness of M.W.'s statement and M.W.'s availability for cross-examination.

126

In assessing the trustworthiness of a child's statement for purposes of N.J.R.E. 803(c)(27), the court must consider the totality of the circumstances, including such factors as: the spontaneity of the child's statements; whether the child consistently repeated the allegations; the child's mental state; whether the child used terminology expected of child of similar age; and whether the child had a motive to fabricate. P.S., 202 N.J. at 249 (citing Idaho v. Wright, 497 U.S. 805, 821-22 (1990)). In addition, the court should consider whether the interview technique bore the indicia of reliability, including: whether there was a lack of investigatory independence; whether the interviewer pursued a preconceived notion of what occurred; whether the interviewer used leading questions; and whether there was any indication of outside influences on the child's statements. Id. at 250 (citing Michaels, 136 N.J. at 308); accord State ex rel. A.R., 234 N.J. 82, 103-04 (2018).

There are valid reasons to question the reliability of the disclosures M.W. made during the forensic interview performed by Detective Psaroudis, and that defendant was deprived of due process and a fair trial because he was not permitted to fully explore those issues at trial, including through his expert's criticism of Detective Psaroudis's interview technique. Defendant argues, contrary to the court's finding on the tender years motion, M.W.'s disclosures

were not entirely free of "leading, manipulative, or coercive questions that could taint the reliability and trustworthiness of the statements." On this point, defendant contends: M.W.'s statements about the substance of the allegations were not spontaneous, but instead were drawn out over the course of a long interview; Detective Psaroudis, who lacked investigatory independence, pursued a preconceived idea about what occurred; she asked many leading questions, particularly about the substance of the allegations, based upon her knowledge of defendant's letter and statements to A.W.; and Detective Psaroudis repeatedly used the word "vagina" in her questioning and expressly asked M.W. to go along with that terminology, notwithstanding that M.W. most consistently used the word "bladder."

Notwithstanding the deferential standard of review, A.R., 234 N.J. at 104; P.S., 202 N.J. at 250, in light of defendant's legitimate arguments regarding the conduct of the interview, which we have reviewed and considered, and with the benefit of Del Russo's report and testimony, which the court did not have when deciding the tender years motion, we hold that on remand the trial court should reconsider the admission of M.W.'s statement to Psaroudis and conduct a new Rule 104 hearing with Del Russo's opinions considered and any expert the State may choose to proffer.

128

However, we find no issue with the court's findings with respect to M.W.'s availability to testify. M.W. testified and was available for cross-examination, notwithstanding her memory lapses. Harrell, 475 N.J. Super. at 567. Moreover, it appears from the record defense counsel admittedly made a strategic choice not to aggressively cross-examine M.W. about the details of the statements she made during the videotaped interview, such that he cannot claim a denial of his right of confrontation. State v. Nyhammer, 197 N.J. 383, 389, 394-96, 410-14 (2009).

> [A] defendant cannot assert that he was denied his right of confrontation unless he first attempts to cross-examine the witness on the core accusations in the case. Because defendant had the opportunity to cross-examine the child at trial about her out-of-court testimony implicating him in the crime but chose not to do so, he cannot claim that he was denied his right of confrontation.
>
> [Id. at 389.]

For the reasons discussed, on remand, the court must reconsider the admissibility of M.W.'s video recorded statement to Detective Psaroudis.

## VIII.

In point XIX, defendant contends the trial court abused its discretion in granting the State's 2019 motion for M.W. to testify via closed circuit television, and in denying defendant's motion to reopen this issue in 2021, two years after

129

the original ruling. While we find no error in the 2019 order, we conclude the court abused its discretion in denying defendant's 2021 motion to reopen the issue. On remand, this issue shall be addressed anew with a hearing to find the facts as they presently exist.

In 2019, in anticipation of trial, the State moved to permit M.W. to testify via closed circuit television. The court held a hearing on April 24, 2019, and took evidence from five people.

First, Gina Adone, a psychologist at Treehouse Therapy who was treating M.W., testified that M.W. is "very guarded" and "shuts down a little bit" and "becomes . . . quieter" and "more reserved" and "make[s] less eye contact" when asked to talk about serious issues relating abuse or trauma. She further testified that M.W. did not want to testify at trial or see defendant, and she was "overwhelmed," "nervous," "intimidated" and "embarrassed" at the prospect of being in a courtroom with people staring at her. In her opinion, M.W. should not be required to testify in the courtroom because it would "hurt her emotionally," "cause a lot of distress," and "set her back" in the progress she had made.

Second, Paige Ortega, a social worker who treated M.W. at Ginnie's House for about two years from approximately January 2017 through December

130

2018, testified that M.W. expressed mixed emotions about defendant, including fear and sadness but also love. She would slouch, make less eye contact, become quieter when talking about what happened to her, and she did not want to see defendant. She opined that it would not be in M.W.'s best interests to testify in a courtroom because she was "very shy" and could be "very timid"; "it would put a lot of stress on her" and "be very intimidating to her" and this might impact her ability to testify, as she may not "be a hundred percent if she was that overwhelmed."

Third, M.W., then eight years old and soft-spoken, understood she was there to speak with the judge because her grandfather had done something. However, she was unaware of any ongoing court proceedings and had little understanding of such matters. She demonstrated an ability to distinguish between the truth and a lie and expressed her willingness to tell the truth in any testimony. She said she used to like visiting her grandparents but did not want to see them anymore because of what her grandfather did. She also said she felt good about being in the courthouse and meeting with the judge. However, she visited the courtroom and said she would be nervous and scared if she were sitting in that room with a lot of people and had to speak in front of them.

A-0798-22

Fourth, C.W. testified M.W. had become more nervous than usual as the trial date approached. She had an incident of bedwetting, she was more distracted at school, and she told him she did not want to go to court and speak with the judge.

Finally, A.W. testified M.W. did not want to engage in conversations about going to court. When A.W. would raise the topic, M.W. would clam up, become fidgety, and change the subject. She also "shut down" when they visited the courtroom a few weeks earlier, and she expressed she did not want to be there in a crowd of strangers. A.W. also stated M.W. recently had become less focused at school, and she had two bedwetting incidents–the one C.W. mentioned and another one as well.

By order and opinion dated May 2, 2019, the court granted the State's motion. The judge explained he found it "very, very difficult" to engage with M.W., particularly relating to the subject matter of the case. She was "timid" and "showed evidence of anxiety"; "she was close to being actively distressed," and if everyone had not been careful "she would have shut down completely."

Based upon his own conversation with M.W., and the witness testimony, the judge found by clear and convincing evidence "that there is a substantial likelihood that this little girl would suffer severe emotional and mental distress,

A-0798-22

if required to testify publicly as we would demand an adult do in the presence of the public, the jury, and the defendant."

The court explained:

> I[t] reach[es] that conclusion because of having the opportunity to have a fairly, [the court] hope[s], good, broad understanding of what the dynamics of the case are and, secondly, meeting the young girl face-to-face, engaging her, attempting to gently engage her, assess her, and she . . . manifested in [the court's] view anxiety, timidity, apprehension, and this was in a fairly controlled setting.
>
> When [the court] think[s] about the proposition of bringing this eight-year-old girl in this case into this or another courtroom and compelling her to bear witness against her grandfather in a public setting, in addition to the statutory findings that [the court] made, [the court] would add that [it] think[s] it would be cruel. She is eight. She is not [eighteen]. She's not [sixteen]. She's not [fourteen]. She is eight. She is in the middle of this distressing situation. She manifested that she understands within the limits of an eight-year-old what it all means for her and her family and that it is ongoing.
>
> [The court] believe[s], to compel her to bear witness in a way that we would demand from an adult, that there is a substantial likelihood that she would be traumatized by that, in addition to the overall experience in a way that she would suffer from for years to come, that it would be severe emotional and mental distress.
>
> The Legislature when they created this statute, [the court] think[s], in a sense, had a child just like this in this situation in mind. [The court] also want[s] to

133

A-0798-22

add that [the court has] factored into [its] assessment the fact that [the court] think[s] that the parents, [the court's] impression from their testimony, [the court's] impression from the child are good protective nurturers, the way they spoke about the child and their dealing with all of this.

She has the advantage, in a sense, of having that kind of family support. So, that would tend to ameliorate and reduce, in a sense, the likelihood and the severity of emotional or mental distress that we're talking about. [The court] think[s] they've done a good job in dealing with the situation.

Despite that, the presentation of the girl to [the court] and just [its] common-sense assessment of her age and the dynamics of this case still lead [the court] to conclude that the statute has been satisfied, despite the best efforts of the parents.

The trial was then delayed, and ultimately it did not begin until March 2022, largely due to the COVID-19 pandemic. In anticipation of the rescheduled trial date, in 2021, defendant moved for the court to revisit its decision to permit M.W. to testify via closed circuit television. Given the passage of time, defense counsel asked that the court make new findings and issue a new ruling based upon the facts as they presently existed.

By order and opinion dated March 12, 2021, the court denied the motion. The court found no legal requirement that the decision on closed circuit testimony be made in close proximity to the trial date, nor that the issue be

reconsidered if the trial is delayed. The court also found no basis to reconsider the prior judge's findings because "[t]he victim in this case is still a juvenile and the defense has not offered anything to indicate testimony would be any less harmful or traumatic to the victim." Further, the court noted to the extent defendant was making a motion for reconsideration, the motion was untimely.

Finally, the court found that reopening the issue would subject M.W. to another testimonial examination, which was contrary to the purpose of N.J.S.A. 2A:84A-32.4, the Victim's Rights Amendment to the New Jersey Constitution, art. I, ¶ 22, and the Crime Victim's Bill of Rights, N.J.S.A. 52:4b-36(a) and (c). That is, the court concluded: "Forcing the victim who, although almost two . . . years older, is still a young child, to come back into court and talk about how she feels and how scared she is here would violate her rights."

Under the Sixth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, U.S. Const. amends. VI and XIV, and under the New Jersey Constitution, art. 1, ¶ 10, the accused in all criminal prosecutions have the right "to be confronted with the witnesses against" them. Maryland v. Craig, 497 U.S. 836, 844 (1990). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of

135

an adversary proceeding before the trier of fact." Id. at 845. The elements of the right to confrontation, which serve that central concern, include: the physical presence of the witness; the requirement that the witness swear an oath; cross-examination of the witness; and the ability to observe the witness's demeanor. Id. at 846.

The right to face-to-face confrontation is not universally applied. Id. at 847-50. However, it may be dispensed with "only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Id. at 850.

In New Jersey, with respect to the prosecution of specific offenses, including aggravated sexual assault, sexual assault, and endangering the welfare of a child, N.J.S.A. 2A:84A-32.4(a)(1) provides: "[T]he court may, on motion and after conducting a hearing in camera, order the taking of the testimony of a victim . . . on closed circuit television at the trial, out of the view of the jury, defendant, or spectators upon making findings as provided in subsection b. of this section." However, in granting such an order:

> [T]he court shall assure that:
>
> (a) the victim or witness will testify under oath;
>
> (b) the victim or witness will submit to cross-examination by the defendant's attorney; and

(c) the defendant, jury, and judge will be permitted to observe the demeanor of the victim or witness when making testimonial statements using closed circuit television.

[N.J.S.A. 2A:84A-32.4(a)(2).]

As for the findings the court must make on a motion, and the standard of proof, N.J.S.A. 2A:84A-32.4(b) provides:

An order under this section may be made only if the court determines by clear and convincing evidence that there is a substantial likelihood that the victim or witness would suffer severe emotional or mental distress if required to testify in the presence of spectators, the defendant, the jury, or all of them. The order shall be specific as to whether the victim or witness will testify outside the presence of spectators, the defendant, the jury, or all of them and shall be based on specific findings relating to the impact of the presence of each.

N.J.S.A. 2A:84A-32.4(d) and (e) provide:

d. The defendant's counsel shall be present in the same room as the victim or witness at the taking of testimony on closed circuit television. The defendant and the defendant's attorney shall be able to confer privately with each other during the testimony by a separate audio system.

e. If testimony is taken on closed circuit television pursuant to the provisions of this section, the video portion of the testimony shall not be recorded and shall not constitute part of the record on appeal. All audio transmissions, except private conversations between

137

the defendant and the defendant's attorney, shall be recorded and thereafter shall be subject to the following provisions:

. . . .

(2) If the victim or witness is under the age of [eighteen] at the time of the court proceedings, any recording of the audio portion of the closed circuit testimony shall not constitute part of the record on appeal and shall be deemed confidential and not available to the public, unless the court orders otherwise for good cause shown upon motion of the parties. In making the determination regarding the availability of the audio portion of the testimony, the court shall consider potential trauma or stigma to the victim or witness. A transcript of the audio portion of the closed circuit testimony shall constitute part of the record on appeal, subject to any personal identification safeguards contained in section 1 of P.L.1989, c.336 (C.2A:82-46).

This statute and statutes like it have been found constitutional—consistent with the right of confrontation. Craig, 497 U.S. at 857, 860; State v. Crandall, 120 N.J. 649, 651 (1990).

That is, in Craig, 497 U.S. at 857, the Court held:

[W]here necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by

> subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation.

In each instance, however, there must be "a case-specific finding of necessity." Id. at 860.

Here, the court's initial ruling in 2019, permitting M.W. to testify by closed circuit television, was supported by the evidentiary record developed at the hearing. State v. Smith, 158 N.J. 376, 380-87 (1999); Crandall, 120 N.J. at 655-56, 663-64; State v. Delgado, 327 N.J. Super. 137, 142-44 (App. Div. 2000). However, the court's ruling in 2021 was not.

Between the original decision in 2019 and the trial date in 2022, M.W. aged from eight to eleven years old. Although she remained a juvenile, there is a significant difference between these two ages in terms of physical, mental, and emotional maturity. Indeed, at trial in March 2022, the prosecutor was permitted to present a school photo for M.W. from 2016, after arguing that M.W. was "significantly different than she was back then."

Furthermore, the record reflects that as of 2019, M.W. was continuing in therapy. Thus, it was possible in addition to having grown older, she would have become more resilient and able to testify in a courtroom as opposed to via closed circuit television. On this point, there was some conflicting information from the trial record, with the parties appearing to have switched positions from

the pretrial proceedings. That is: after M.W. testified defense counsel stated "[s]he appeared . . . very shy. Intimidated or scared, it appeared to me"; however, the prosecutor recalled her testimony as responsive to every question asked, without any resistance or uncooperativeness.

Regardless, there remains the strong possibility that the facts developed in 2019 were stale as of 2021. Rather than holding a hearing, engaging with the factual issues, and making a case-specific determination of the present state of affairs, as required under the governing law, the court simply assumed that notwithstanding the passage of years, it would still be traumatic for M.W. to testify, rejecting the notion of "[f]orcing" her "to come back to court and talk about how she feels and how scared she is here." Also, the court found that "the defense ha[d] not offered anything to indicate testimony would be any less harmful or traumatic to the victim." However, it is not clear how the court expected the defense to make such a showing without a hearing. The record developed two years earlier, in 2019, did not provide a basis for the court to make such findings.

Thus, even applying the abuse of discretion standard of review applicable to motions to reconsider, State v. Puryear, 441 N.J. Super. 280, 293 (App. Div.

2015), the court erred in denying defendant's motion because it failed to correctly apply the law. Chavies, 247 N.J. at 257.

Thus, while we find no error in the 2019 order, permitting M.W. to testify via closed circuit television; we find an abuse of discretion in the court's 2021 order, denying defendant's 2021 motion to reopen the issue; and order that the issue be addressed anew on remand, with a hearing to find the facts as they presently exist.

IX.

Finally, in point XX, defendant contends he was deprived of due process due to prosecutorial misconduct in the examination of a witness. While we reject this argument as a basis for reversal, on remand, the testimony at issue should not recur.

At the pretrial Miranda hearing, defense counsel elicited the following testimony from Detective Hassloch:

> Q. And . . . is it your practice to, when you're going to take someone into custody or go to serve a warrant, to do a background check on that individual?
>
> A. Yes.
>
> . . . .
>
> Q. Okay. So had you run what they call a rap sheet . . . on [defendant]?

141

A. We did.

. . . .

Q. Did you find any of that in [defendant's] background?

A. No, we did not.

Q. Did you find any arrests in [defendant's] background?

A. I believe there was one from awhile back in I think Kansas, but it was -- I believe it was a misdemeanor charge.

Q. So you knew you were dealing, or you believed you were dealing, with someone who has really no prior involvement with the criminal justice system. Correct?

A. Yes, sir

At trial, defense counsel again cross-examined Detective Hassloch about any investigation he had done about defendant prior to arresting him. However, notwithstanding the testimony given at the pretrial hearing, it does not appear defense counsel sought a cautionary instruction to Detective Hassloch to avoid mention of the misdemeanor charge. The following transpired:

Q. In your practice as a detective when you're going to serve a warrant, do you do any background check or background information to familiarize yourself with the individual that you're going to be engaging with?

142

A-0798-22

A. Yes, sir.

    . . . .

Q. Did you find anything with regard to [defendant]?

A. I think there was a misdemeanor charge from years prior, but nothing substantial.

Q. And when you say year prior –

A. Maybe [seventies].

Q. I'm sorry?

A. Maybe in the [seventies].

Q. In the [seventies]. So for [forty-six] years he had nothing, and the one thing he did have was a misdemeanor. When you say misdemeanor, we don't use misdemeanor in New Jersey, correct?

A. No, sir.

Q. But a misdemeanor is the lowest of low, like, offenses, correct?

A. Yes.

Q. Could be a trespass?

A. Sure.

Q. Nothing dangerous? Nothing –

A. No, sir.

Q.  So you knew you were going out to deal with someone who had no history and wasn't a frequent flyer in the criminal justice system?

A.  Yes, sir

Defense counsel did not object or move to strike Detective Hassloch's mention of "a misdemeanor charge," nor did he request a cautionary instruction.

The record indicates defendant had no prior criminal history, such that Detective Hassloch's testimony about the misdemeanor charge in another state was incorrect. Defendant raised this issue in his motion for a new trial. However, the court rejected the argument and denied the motion, stating in pertinent part:

> The [d]efense also argues that there is this ongoing misconduct by Detective Hassloch testifying in response to a question from Mr. Ranges as to whether . . . when Detective Hassloch was gathering information to be prepared to effectuate an arrest, whether he became aware if the defendant had any kind of a prior criminal history involving violence that the police should be aware of so they can be properly prepared for how they're going to carry out the steps in effectuating such an arrest. [The court] find[s] that in an effort to be thorough and complete in his answer, . . . Detective Hassloch testified as to all of the information that he had discovered in making those inquiries. And that included some obscure reference to maybe there being a misdemeanor, maybe out of Kansas, maybe [thirty] plus years ago. A comment that the [c]ourt finds to have been innocuous in that context; so innocuous that the [c]ourt did not pick up on it, thinking that there was

144

A-0798-22

> any need to make any kind of an immediate instruction to the jury.
>
> The [d]efense elected to allow it to pass by, decided that it was not worthy of asking that it be stricken from the record and/or that there be any kind of a curative instruction provided to the jury in connection with that statement. Yet it now forms the basis, despite what appears to have been an innocent comment, of this ongoing pervasive plan of prosecutorial misconduct that was apparently hatched from the moment that the defendant was arrested, if not even before that, when they were figuring out how to arrest the defendant, right up through the summation that the State presents in the case.

Since defendant did not raise this issue in a timely manner at trial, our review is for plain error. R. 2:10-2; State v. Greene, 242 N.J. 530, 554 (2020).

The admission of a defendant's prior bad acts is subject to careful judicial scrutiny. See N.J.R.E. 404(b); State v. Cofield, 127 N.J. 328, 338 (1992). Here, however, the State did not move to admit the evidence, and defendant did not seek to exclude it, so the court did not consider the issue before Detective Hassloch's testimony.

Viewed in context of the entirety of the trial, Detective Hassloch's passing reference on cross-examination to an unspecified "misdemeanor charge" from over forty years earlier, did not have the capacity to lead to an unjust result. State v. Gorthy, 226 N.J. 516, 540 (2016). If defense counsel believed it did, he

would have made an appropriate motion at trial. His failure to do so indicates his belief that the error was harmless. Frost, 158 N.J. at 83-84.

"Trials, particularly criminal trials, are not tidy things. The proper and rational standard is not perfection; as devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness." State v. R.B., 183 N.J. 308, 333-34 (2005); see also State v. Weaver, 219 N.J. 131, 155 (2014) (noting the principle that defendants are entitled to a fair trial, not a perfect one).

We conclude the court properly denied the motion for a new trial to the extent it was based upon plain error in Detective Hassloch's testimony. As noted however, on remand the trial court shall ensure that this testimony does not recur.

X.

In sum, we conclude defendant's judgment of conviction shall be vacated and the matter remanded for a new trial due to the following errors: (1) the admission of defendant's December 8, 2016 statement to the police; and (2) the limitations placed upon the testimony of defendant's expert. Additionally, on remand, the court shall: (1) reconsider the admissibility of M.W.'s video recorded statement to Detective Psaroudis; (2) reexamine M.W.'s ability to

testify in the courtroom, as opposed to by closed circuit television; and (3) ensure there is no reference to a non-existent misdemeanor charge in defendant's past.

We affirm in part and reverse in part. We vacate defendant's judgment of conviction and remand for a new trial consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0798-22